[Cite as *In re L.G.*, 2022-Ohio-529.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE L.G., ET AL. | : | |
| | : | No. 110789 |
| Minor Children | : | |
| | : | |
| [Appeal by J.G., Mother] | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 24, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD21904161 and AD21904162

### *Appearances:*

Michael Gordillo, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Appellant-mother J.G. ("Mother") appeals the decision of the Cuyahoga County Court of Common Pleas, Juvenile Division (the "juvenile court"), that terminated her parental rights and granted permanent custody of her sons, L.G. and W.W., to appellee, the Cuyahoga County Division of Children and Family

Services ("CCDCFS" or "the agency").  Mother contends that the juvenile court's finding that the agency made reasonable efforts to reunify the family was not supported by clear and convincing evidence and that the juvenile court, therefore, erred in granting permanent custody of the children to the agency.  For the reasons that follow, we affirm.

**Factual Background and Procedural History**

{¶ 2}   Mother has given birth to four children:  N.G. (d.o.b. May 10, 2011), D.G. (d.o.b. December 16, 2012), L.G. (d.o.b. August 23, 2018) and W.W. (d.o.b. July 17, 2019).  Her two youngest children, L.G. and W.W., are the subject of this appeal.

{¶ 3}   On May 17, 2021, CCDCFS filed a complaint for dependency, neglect and permanent custody of L.G. and W.W.[1] along with a motion for predispositional temporary custody.  The complaint alleged that Mother:  (1) lacks appropriate judgment and parenting skills to be able to provide a safe home for the children; (2) has mental-health diagnoses that prevent her from providing appropriate care for the children; (3) has "inconsistently engaged" in treatment to adequately manage her mental health; (4) has a substance abuse problem, specifically, marijuana and alcohol, that prevents her from providing appropriate care for the children and (5)

---

[1] A prior complaint for dependency, neglect and permanent custody of L.G. and W.W. was filed on December 31, 2019 (Cuyahoga C.P. Juv. Nos. AD1991559 and AD1991560).  The case was not resolved within statutory time limits and was dismissed. Several other refilings and dismissals followed (Cuyahoga C.P. Juv. Nos. AD20907759, AD20907760, AD20909870, AD20909871, AD21901270 and AD21901271).  In each case, the agency was granted emergency custody or predispositional temporary custody of L.G. and W.W.

has failed to benefit from substance-abuse services or to reengage in substance-abuse services following a relapse. The complaint further alleged that L.G. and W.W. had been in the uninterrupted custody of the agency since December 31, 2019, that Mother's two older children had been adjudicated abused or neglected and were in the temporary custody of CCDCFS (Cuyahoga C.P. Juv. Nos. AD18909354 and AD18909355) and that L.G. had been previously adjudicated dependent was committed to the protective supervision of CCDCFS (Cuyahoga C.P. Juv. Nos. AD18910608) due, in part, to Mother's ongoing mental-health and substance-abuse issues. The complaint also alleged that reasonable efforts had been made to prevent removal of the children from the home and that removal of the children from the home was in their best interest.[2]

{¶ 4} The agency supported its motion for predispositional temporary custody with an affidavit from CCDCFS social worker Angella Bishop. In her affidavit, Bishop attested to the allegations of the complaint. She further averred that "the following reasonable efforts were made" by the agency:

1.      The services provided to prevent or eliminate the need for removal of the children from the home prior to placement and the actions that will be taken following placement to make it possible for the children to return home: mental health assessment and treatment, substance abuse assessment and treatment, nurturing parenting.

2.      Why these services did not prevent the removal of the children from the home or enable the children to return home: mother

---

[2] With respect to the children's fathers, the complaint alleged that the children's fathers had failed to established paternity and had failed to visit, support or communicate with the children.

> has not benefited from services offered, and has inconsistently engaged in service[.]

(Emphasis deleted.)

### Hearing on Motion for Predispositional Temporary Custody

{¶ 5} On May 19, 2021, the magistrate conducted a remote hearing[3] on the agency's motion for predispositional temporary custody. Mother attended the hearing. CCDCFS presented testimony from Bishop and Mother's then mental-health counselor, Alpha Stewart.

{¶ 6} Bishop testified that the case originally came to the agency's attention due to Mother's mental-health issues and because Mother had left the children home alone. Bishop stated that Mother's outstanding issues involved her mental health, substance abuse and Mother's inability to meet her children's basic needs.

{¶ 7} With respect to Mother's mental health, Bishop testified that Mother suffers from depression and post-traumatic stress disorder ("PTSD"). Bishop indicated that Mother receives mental-health services but that she is not medication compliant and "her behavior is still not where it should be." Bishop stated that Mother had been in the hospital two times in the past week for her mental-health issues. Bishop testified that Mother had been seeing the same mental-health counselor, Stewart, for five years but that the agency did not believe Mother's

---

[3] The are some issues with the transcript of this hearing. The transcript contains numerous notations reflecting that all or part of a question or response was "inaudible." In addition, the transcript contains several obvious errors and appears, at times, to be missing a portion of a question or response.

engagement with mental-health services was resolving her mental-health issues and that Mother's mental health was visibly "declining."

{¶ 8} With respect to Mother's substance abuse, Bishop testified that in the past, Mother had had issues with alcohol-induced blackouts. Bishop stated that when she met with Mother a week before the hearing, Mother admitted to her that she was still smoking marijuana. Bishop testified that the agency had asked Mother to submit to urine screens but that Mother had failed to do so. Bishop could not state, however, when the agency had last submitted the paperwork necessary for Mother to obtain a urine screen.

{¶ 9} With respect to Mother's ability to meet her children's basic needs, Bishop stated that when W.W. was in Mother's care, he had failed to thrive, i.e., that at five months old, he weighed only ten pounds, and that when W.W. was in the hospital, hospital staff had reported that Mother smelled of alcohol. Bishop testified that Mother had recently secured an apartment but that Mother's apartment was not appropriate for the children, i.e., there were no beds for the children, her home was not clean, dishes were in the sink and clothing was strewn all over the floor in multiple rooms.

{¶ 10} Stewart testified that she had been Mother's mental-health counselor since 2015. She indicated that she was also Mother's mental-health case manager because it was difficult to get Mother to engage with another case manager. Stewart stated that because Mother had difficulty keeping scheduled appointments, she kept

her schedule "open" for Mother, i.e., Mother could call Stewart and speak with her after hours or whenever Mother was available.

{¶ 11} Stewart testified that, based on her history with Mother, Mother had, at times, made "some progress" with her mental health but that in the last 90 days, Mother had "been in decline mentally," exhibiting "increased mental health symptoms." Stewart could not "directly pinpoint" what had caused Mother's mental health decline but noted that Mother had recently started working at AutoZone and that stress associated with working or Mother's upcoming court hearings could have been a "trigger" for her decline. Stewart testified that Mother is on prescribed medication and that a nurse drops off Mother's medication for her. She stated that she did not believe Mother was medication-compliant because "when she's on her medication there's a calmness, and it doesn't take a lot to redirect her, where when she's off her medication, it's a lot of redirection * * * she's not letting someone else speak * * * it's kind of hard to have a conversation with her." Stewart testified that she had consulted with, and referred Mother to, her supervisor for additional trauma therapy but that Mother refused to engage with the supervisor.

{¶ 12} Throughout the hearing, Mother interrupted the witnesses' testimony and disrupted the proceedings with emotional outbursts. During such interruptions, Mother, at times, responded to or challenged the witnesses' testimony, providing her own version of the events. At other times, Mother cried, made unrelated comments, was incomprehensible, or stated that she could not breathe.

{¶ 13} Mother denied that she was abusing drugs and stated that she told Bishop only that she had smoked marijuana "a few times." Mother likewise disputed Bishop's testimony that Mother had only recently secured housing and denied that it was her fault that W.W. had failed to thrive and stated that she "did everything [the doctors] told me to do."

{¶ 14} Mother also disputed Bishop's testimony that she had been recently hospitalized for her mental health, stating "that's a lie," and claimed that she had been hospitalized due to stomach issues. Mother stated that she was supposed to see her doctor for a follow-up appointment that morning but had chosen "to be in [c]ourt" instead because she did not want it to appear as if she did not care about her children.

{¶ 15} Mother stated that, in the past, she had suffered "countless rapes and molestations" and had previously tried to commit suicide, but that once she had children, she "had something to live for, something to protect" and that the agency had taken that from her. Mother stated that coming to court was "worse than [her] grandfather's death" and that she was "fighting for my kids because won't nobody else do it." Mother stated that "if I have to fall down to the ground helping my kids, so be it, because that's what a mom is supposed to do."

{¶ 16} Mother claimed that she lost custody of her children "over an honest to God mistake." Mother stated that she knew that she should have taken the children to her aunt's house or daycare, but that she was homeless, the children were asleep and she had to go to work that day "to try and get us a new home again."

Mother stated: "Y'all caught us in a f***** up situation. Y'all caught us at the end of our homelessness, but y'all don't see that." Mother claimed that she did not engage in trauma therapy with Stewart's supervisor because she did not "connect well" with her.

{¶ 17} After Bishop and Stewart completed their testimony, Mother's counsel asked Mother if she wished to testify. Mother initially responded, "Come on. Come on. Come on with the questions," but it appears that she ultimately declined to testify. Although it does not appear from the transcript of the hearing that Mother was ever placed under oath, the magistrate indicated that she would "take into consideration all of the replies that [M]other's made" when reaching her decision.

{¶ 18} The magistrate also heard from the children's guardian ad litem. The guardian ad litem stated that she had been working with the family since 2018 and that Mother's issues involved her mental health, housing and substance abuse, specifically, alcohol. The guardian ad litem reported that although Mother now has housing, the conditions of her home are not appropriate for small children. The guardian ad litem, therefore, recommended that emergency custody of L.G. and W.W. be granted to the agency.

{¶ 19} At the conclusion of the hearing, the magistrate entered an order committing L.G. and W.W. to the predispositional temporary custody of the agency. In each of its journal entries, the magistrate included the following reasonable-efforts findings:

FINDING WHETHER REASONABLE EFFORTS WERE MADE BY AGENCY (ORC §2151.419)

The Court further finds that reasonable efforts were made to prevent the removal of the child from the home, to eliminate the continued removal of the child from the home, or to make it possible for the child to return home. The relevant services provided by the Agency to the family of the child and reasons why those services did not prevent the removal of the child from home or enable the child to return home are as follows: mental health services, parenting classes, and chemical dependency assessment and treatment.

{¶ 20} On May 27, 2021, Mother filed an objection to the magistrate's decision, asserting that she is "ready, willing, and able to care for the children independently," that there are "no reasonable grounds" to believe that the children are in "immediate danger from their surroundings" or that "removal is necessary to prevent immediate or threatened physical or emotional harm" and that the weight of the evidence presented at the hearing supports a finding that predispositional temporary custody is "not necessary" and "not in the best interest of the children." Mother did not object to the magistrate's reasonable efforts finding. Mother requested that the juvenile court order overrule the magistrate's decision, that she and the children be reunited and that she be granted legal custody of the children without further involvement of CCDCFS. CCDCFS filed an opposition to Mother's objections, identifying the testimony that it believed supported the magistrate's decision.

{¶ 21} On June 11, 2021, the juvenile court overruled Mother's objections, finding them "not well-taken," and approved and adopted the magistrate's decision.

**The Case Plan**

{¶ 22} In July 2021, CCDCFS refiled the case plan it had previously prepared for the family. The case plan required Mother to (1) undergo an alcohol and drug assessment, successfully complete any recommended treatment and aftercare, refrain from using drugs and alcohol and submit to random drug screens; (2) work with her mental-health provider on a trauma-based curriculum, take prescribed medication and engage in mental-health services, including attending all appointments and complying with any additional recommendations; (3) maintain safe housing that is "clean, sanitary and free of safety hazards" and (4) complete a parenting program and demonstrate an ability to provide for her children's basic needs, including providing sober care for the children, ensuring that the children attend medical appointments and demonstrating an understanding of child development.[4]

**The Guardian Ad Litem's Written Report and Recommendation**

{¶ 23} On July 6, 2021, the guardian ad litem (who served as the guardian ad litem for all four children) filed a written report and recommendation.[5] The

---

[4] It is not entirely clear from the record whether Mother signed the case plan. In the block of the case plan designated for the "signature" of Mother, it states "Reason Signature Not Captured: Not Available." However, there is a signature in the adjacent block of the case plan labeled "Signed Date" that may be Mother's signature.

[5] According to her report, the guardian ad litem's recommendation was based on her review of court records and individualized family service plans for L.G. and W.W. and communications with the four children, Mother, Foster Mother, Bishop and the therapist for N.G. and D.G.

guardian ad litem stated that L.G. (who was then nearly three years old) and W.W. (who was then nearly two years old) had been in the same foster home since their removal from Mother's care on December 31, 2019 and that their two older brothers were placed in that foster home in 2020. She reported that she had observed the children via Zoom and that they appeared to well-adjusted to the foster home and to be bonded with the foster parents. The guardian ad litem stated that, according to Foster Mother, when L.G. arrived at the foster home, he wouldn't make eye contact, reach out his arms or "baby babble" but that he was now "a vibrant, inquisitive boy" and his "words and other areas of development[] are slowly improving." The guardian ad litem reported that L.G. is receiving "Help Me Grow" services, with concerns for autism, and that referrals had been made for L.G. to see a pediatrician specializing in developmental delay. The guardian ad litem further reported that when W.W. was discharged from the hospital and placed in the foster home, he had had a very strict feeding schedule but that, according to Foster Mother, he was now thriving. She indicated that referrals had also been made for W.W. to receive services.

{¶ 24} The guardian ad litem stated that she had recently spoken with Mother and that Mother believed the children should be returned to her because she had "finished her case plan," has a job and has been able to maintain housing. The guardian ad litem noted that Mother has struggled with substance abuse and mental-health issue since 2018 and that even though she has housing, she has not been able to maintain a safe, clean and sanitary environment for the children.

Referencing Stewart and Bishop's testimony from the May 19, 2021 hearing, the guardian ad litem reported that although Mother "had been referred for services regarding her mental health and substance abuse for the last two years," Mother "has not been consistent [with] and benefited from her services." The guardian ad litem stated that the children "need a stable home," that the children are "doing great" in their foster home and that the foster parents are willing to adopt all four children. Accordingly, the guardian ad litem recommended that permanent custody of all four children be granted to the agency.

**Adjudication Hearing**

{¶ 25} The adjudication hearing was held on August 3, 2021. Mother was not present at the hearing. Mother's counsel requested a continuance to secure her attendance. The juvenile court found that Mother had been given proper notice of the hearing and proceeded with the hearing in her absence.

{¶ 26} Bishop testified at the hearing. She testified that L.G. and W.W. had been in the uninterrupted custody of the agency custody for approximately 20 months, i.e., since December 31, 2019, and that Mother's outstanding issues were with mental health, substance abuse and housing. Bishop indicated that Mother is currently diagnosed with major depression, PTSD and mild intellectual disorder and that, in the past, she also had mood swings and had been diagnosed as bipolar. Bishop stated that due to her PTSD, Mother "becomes angry and can be violent" and that Mother also has "child-like ways." Bishop testified that when she met with Mother on May 11, 2021, Mother exhibited signs of mental-health issues, i.e., she

was "shaking," "twitching," "pulling on her hair," cursing and "talking irrational at times." Bishop stated that she had also witnessed Mother's "irrational" behavior during the May 19, 2021 hearing, where she said Mother "wouldn't stop talking," "would not calm down," called Bishop "a liar" and "threatened to kill" Bishop and Stewart, Mother's then mental-health counselor.

{¶ 27} With respect to Mother's substance abuse, Bishop testified that when she met with Mother on May 11, 2021, Mother told her that she was currently using marijuana and "a little alcohol." Bishop related that Mother did not indicate the "quantity" of marijuana she was using and that Mother had not recently submitted to a drug test. Bishop testified that Mother was unable to meet the children's basic needs because she could not "keep a job" due to her substance abuse. Bishop stated that Mother's housing was also a concern because when she went inside Mother's home on May 11, 2021, the home was "unclean" and "unkempt," clothing was "all over the floor," a litter box was on the kitchen counter and animal feces were on the floor. Bishop indicated that she did not look inside Mother's refrigerator or cupboards to see if Mother had food in the home because there were no children in the home and Mother, at that time, "appeared to be having an episode."

{¶ 28} Bishop testified that CCDCFS had temporary custody of Mother's two older children, D.G. and N.G., and identified certified copies of judgment entries

adjudicating the children as neglected (N.G.) and neglected and abused (D.G.), which were then admitted into evidence.[6]

{¶ 29} Bishop testified that Stewart, who had worked for Empowering Integrated Care, had been providing in-home mental-health counseling services to Mother for approximately five years but that that relationship had recently

---

[6] In Cuyahoga C.P. Juv. Nos. AD18909354 and AD18909354, N.G. was adjudicated neglected, D.G. was adjudicated neglected and abused and the children were thereafter committed to the temporary custody of the agency based on Mother's stipulation to the allegations of an amended complaint, which stated, in relevant part:

1.　　In the past, Mother has failed to provide appropriate supervision for the children. Mother has frequently left the children in the care of an inappropriate caregiver. On or about July 22, 2018, D.G. was observed with extensive bruising on his upper and lower back, both sides of his torso and right thigh. D.G. required medical attention. A police investigation is ongoing.

2.　　Mother has an anger management issue which places her children at risk of harm. Mother is willing to engage in services to address this concern.

＊ ＊ ＊

4.　　Mother has a substance abuse problem, specifically alcohol, which prevents her from providing appropriate care for the children. Mother has previously engaged in services to address her substance abuse but has failed to maintain her sobriety and continues to abuse alcohol despite being 9 months pregnant. Mother has recently engaged treatment with Murtis Taylor.

5.　　Mother has been diagnosed with depression and PTSD and recommended for medication and counseling. Mother is taking medication and is engaged in services with Murtis Taylor.

＊ ＊ ＊

Reasonable efforts were made by Cuyahoga County Division of Children and Family Services to prevent the removal of the child [sic] from the home and removal is in the best interest of the child [sic].

terminated because Mother said she no longer wanted Stewart as her counselor and Stewart left Empowering Integrated Care. Bishop stated that Mother told her that she intended to engage in mental-health counseling with another counselor at Empowering Integrated Care. Mother did not present any witnesses at the hearing.

{¶ 30} Based on the evidence presented at the hearing, the juvenile court found that the allegations of the complaint had been proven by clear and convincing evidence and adjudicated L.G. and W.W. neglected and dependent children. The juvenile court further found, as to each child, that the child's continued residence in, or return to, Mother's home would be contrary to his best interest and made the following reasonable-efforts findings:

> The Court finds that the Cuyahoga County Division of Children and Family Services has made reasonable efforts to prevent the removal of the child from the home, to eliminate the continued removal of the child from the home, or to make it possible for the children to return home. These efforts are: Mental health services offered. Counseling offered.

**The Dispositional Hearing**

{¶ 31} On August 4, 2021, the case proceeded to a dispositional hearing. Bishop and the children's foster mother, T.B. ("Foster Mother"), testified at the hearing. The dispositional hearing was a joint hearing on the complaint for permanent custody as to L.G. and W.W. and a hearing on motions to modify temporary custody to permanent custody the agency had filed as to N.G. and D.G. in Cuyahoga C.P. Juv. Nos. AD18909354 and AD18909355. Mother was not present at the hearing. Once again, Mother's counsel requested a continuance to secure her

attendance. Once again, the juvenile court found that Mother had been given proper notice of the hearing and proceeded with the hearing in her absence.

{¶ 32} At the permanent custody hearing, Bishop reiterated much of the testimony she had given at the prior hearings. Bishop testified that the agency had been involved with the family since 2018, when N.G. and D.G. were committed to agency custody, and that L.G. and W.W. had been in agency custody since December 31, 2019. Bishop stated that she had been personally involved in the case for approximately two months but that she had reviewed and was familiar with the case file, including the actions taken by prior case workers.

{¶ 33} Bishop testified that the case plan developed by the agency was designed to assist Mother in addressing mental health, substance abuse and housing issues. Bishop stated that Mother had been struggling with mental-health issues since she was a youth and that, over the years, the agency had made several referrals for mental-health services for Mother, the latest being to Empowering Integrated Care. Bishop indicated that Mother was currently diagnosed with major depression, PTSD and mild intellectual issues and, until recently, had been in treatment with the same mental-health counselor, Stewart, for five years. Bishop stated that based on her review of the case file, Mother's "behavior went up and down" during her time in therapy. She indicated that Mother had had a good relationship with Stewart and that Stewart appeared to be the only one who could "work well with mom."

{¶ 34} Bishop testified that Mother fired Stewart as her mental-health counselor after Stewart testified at the emergency custody hearing on May 19, 2021.

Bishop stated that during Stewart's testimony, Mother became "extremely angry" and "kept talking over" Stewart. According to Bishop, the longer Stewart testified, the angrier Mother became until Mother eventually told Stewart, "I'm going to kill you and I want you off my case." Bishop noted that the case plan required Mother to take medication that had been prescribed for her by her psychiatrist, that Stewart had testified that Mother's mental health had been deteriorating, possibly due to a lack of medication. Bishop testified that Stewart's former supervisor had recently advised her that Mother had not been medicine compliant since July 23, 2021.

{¶ 35} Bishop stated that, notwithstanding her five years of mental-health treatment, Mother had "not made that much progress" on the mental-health objectives of her case plan and that Mother's mental health "is still not stable enough" for Mother to raise her children. Bishop indicated that, due to her PTSD, Mother has shown anger, violence and "some erratic behavior" — at times placing the children in danger. As recent examples of Mother's continued struggles with her mental health, Bishop pointed to a February 2021 incident in which Mother and her significant other got into a fight that required a police response and the hearing on May 19, 2021, where Mother "would not stop talking," "disrespected the Court," "wouldn't listen to her attorneys," "appeared to have been very angry" and "threatened" Bishop and Stewart because Mother felt they had "done an injustice to her." Bishop testified that Empowering Integrated Care had been attempting to get Mother another mental-health counselor but that Mother was refusing to engage with any other counselor.

{¶ 36} With respect to Mother's substance abuse, Bishop testified that Mother had used "many different types of drugs which also helped to alter her mental health" and that the case plan required Mother to be drug-free. Bishop stated that, in the past, Mother had submitted to "a few * * * random urine screens" that were positive[7] and that Mother's last urine screen, in January 2020, could not be read due to tampering. Bishop stated she spent "a few hours" with Mother on May 11, 2021 and that Mother told her, at that time, that if she had been required to submit to a urine screen, it would be positive for marijuana.

{¶ 37} With respect to Mother's housing, Bishop testified that when she visited Mother's home on May 11, 2021, it was not appropriate for children. Bishop stated that the home was "unkempt" and that multiple rooms had piles of clothing all over the floor. She noted that Mother had pets in the home, that a litter box was on the kitchen counter and animal feces were on the floor in two rooms. Bishop stated that there were no beds or dressers for the children, that the living room had only a couch and that there was no kitchen table or other furniture in the kitchen where the children could eat. Bishop stated that she did not consider whether Mother might be able to use beds that had been provided to the foster family for the children and that, because no children were in the home, she did not verify whether Mother had food in the home. Bishop testified that after May 11, 2021 Mother refused to allow Bishop access to her home.

---

[7] Bishop did not provide the dates of these tests.

{¶ 38} Bishop testified that all four children were living in the same foster home and that she had visited the children three times in their foster placement. With respect to L.G. and W.W., she noted that the children were friendly but "got into everything" and that the foster mother had to be with the children at all times "monitoring their behavior." Bishop stated that Mother does not have a visitation schedule but is able to have video calls with the children whenever she wishes to do so.

{¶ 39} With respect to the children's fathers, Bishop stated that L.G.'s alleged father was R.R. and that W.W.'s father was unknown. Bishop stated that R.R. was not on the case plan because he did not make himself available to the agency and did not respond to Bishop's calls.

{¶ 40} Foster Mother testified that L.G. came into her care on December 31, 2019, that W.W. came into her care after he was discharged from the hospital on January 8, 2020 and that the two older children came into her care on June 15, 2020. She stated that L.G. and W.W. had "made a lot of progress" since they had arrived in her home. She indicated that when the older children first arrived, they had a number of behavioral issues and outbursts but that in time they too "settled in" and realized that "that's not gonna work here." Foster Mother stated that all of the children were "doing really good" and that none of the children had any existing behavioral concerns "outside of normal children things." Foster Mother indicated that they have a close relationship with the children and that the children call her husband "daddy."

{¶ 41} Foster Mother stated that Mother had no set visitation schedule with the children but Mother could contact them to conduct a video call with the children whenever she wanted. Foster Mother indicated that the frequency of Mother's calls was not consistent, i.e., sometimes she called every week; sometimes there would be two weeks or more between Mother's calls. Foster Mother stated that the older children identify Mother as "my mommy" and are happy and excited to talk with her when she calls. Foster Mother testified that the older children update Mother on what they have been doing, ask her how she is doing and then "kinda go back to what they were doing" before Mother called. She indicated L.G. and W.W. are also excited when they get a video call from Mother but do not identify Mother as "mommy." She stated that if Mother does not call the children for an extended period, the children have "no reaction" and have never asked to call Mother. Foster Mother testified that if the agency was granted permanent custody of the children, she and her husband would like to adopt them.

{¶ 42} Mother presented no witnesses at the hearing.

{¶ 43} At the conclusion of the witnesses' testimony, the guardian ad litem set forth her recommendation on the record. She stated that she believed it would be in the best interest of all four children for permanent custody to be granted to the agency. She indicated that the children have been thriving as a result of the structure provided within the foster home and that "how they changed is really good for them." She stated that the children have "found a place where they are all together,"

that they are bonded with one another and that they also have a strong bond with their foster parents.

{¶ 44} The guardian ad litem stated that Mother has "been a roller coaster the whole two and a half years." She stated that "[t]here were times when she has been good," which is why she was able to keep L.G. with her for a while, but that she then, again, had problems with her mental health and substance abuse, and her children were again removed. The guardian ad litem stated that although the agency had provided services, Mother "has not been able to comply with those."

**The Juvenile Court's Decision to Grant Permanent Custody of L.G. and W.W. to CCDCFS**

{¶ 45} At the conclusion of the dispositional hearing, the trial court ruled from the bench, awarding permanent custody of all four children to the agency and terminating Mother's (and the children's fathers') parental rights. With respect to its evaluation of the evidence related to the agency's efforts to assist Mother, the juvenile court stated:

> Normally, from the outset is the Agency's intention to try to reunify families. Why? Because parents have a Constitutional right to raise their kids, but that's not absolute.
>
> When the Government believes that parents are unable to do so and placing the kids with the parents, allowing them to raise their children puts those children at risk of being harmed either emotionally or physically, then it's the Government's responsibility to step in and provide services so that a parent is equipped with what they need to exercise that fundamental right.
>
> What we have here is an attempt by the Agency to give mom the tools that she needs to be successful in raising her four rambunctious boys, and rambunctious may be, you know, not proper term, but from what [Foster Mother] was saying, they have a lot of energy * * *.

And mom, based on Miss Bishop's statements, doesn't have the ability to be able to manage these four boys.

She is suffering from mental health issues and she has refused to, you know, engage with therapists to try and manage those, to be the proper parent for these boys, and the behavior that she's exhibited in terms of being hostile, being erratic, being threatening, I mean, threatening to kill someone who's a therapist who was trying to assist her, you know, in front of other individuals[,] threatening to harm a social worker who was only trying to provide her with necessary services to reunite her with her children is an indication that mom is suffering from some significant mental deficiency.

* * *

All those are a recipe from some tragic events if mom doesn't take the proper steps to control that.

And notwithstanding reasonable efforts by the Agency to get mom to be compliant, she hasn't been, and what has been presented to the Court is that she's not medication-compliant and may actually be taking illegal drugs as a way to self-medicate, but that's not the proper way.

{¶ 46} On August 16, 2021, the juvenile court issued written journal entries in each case, setting forth its findings. The juvenile court found, by clear and convincing evidence, that L.G. and W.W. could not be placed with one of their parents within a reasonable time or should not be placed with either parent pursuant to R.C. 2151.414(E) — specifically, that "[f]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home" under R.C. 2151.414(E)(1) and "[t]he parent for any reason

is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect" under R.C. 2151.414(E)(14) — and that it was the children's best interest that permanent custody be granted to the agency.

{¶ 47} The juvenile court further found that the agency had made reasonable efforts to reunify the family as follows:

> The Court finds that the Cuyahoga County Division of Children and Family Services has made reasonable efforts to prevent the removal of the child from the home, to eliminate the continued removal of the child from the home, or to make it possible for the children to return home. The Court finds that the Cuyahoga County Division of Children and Family Services has made reasonable efforts to finalize the permanency plan. These efforts are: mental health services, substance abuse assessment, counseling and parent education classes and treatment as recommended mental health service. The mother had no appropriate provisions for the child and could not provide proper housing for child. The mother could not hold a job due to mental illness and was not medicine compliant.[8]

{¶ 48} Mother appealed,[9] raising the following sole assignment of error for review:

> The trial court committed plain, reversible error in finding reasonable efforts were made to reunify appellant with her children L.G. and W.W.

---

[8] In Cuyahoga C.P. Juv. No. AD21904161, involving L.G., the juvenile court further found that "[t]he father did not have a case plan due to not responding to agency after several attempts were made to make contact."

[9] With respect to Mother's two older children, N.G. and D.G., Mother did not timely appeal the juvenile court's order granting the agency's motion for permanent custody. This court dismissed her untimely appeal (Appeal No. 110934) on November 5, 2021.

**Law and Analysis**

{¶ 49} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see also In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 50} Because termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14, it is "an alternative of last resort," *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). "'All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). Where parental rights are terminated, the goal is

to create "a more stable life for the dependent children" and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

**Standard for Terminating Parental Rights and Granting Permanent Custody to CCDCFS**

{¶ 51} An agency may obtain permanent custody of a child in two ways. *In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 44 (8th Dist.), citing *In re E.P.*, 12th Dist. Fayette Nos. CA2009-11-022 and CA2009-11-023, 2010-Ohio-2761, ¶ 22. An agency may first obtain temporary custody of the child and then file a motion for permanent custody under R.C. 2151.413, or an agency may request permanent custody as part of its abuse, neglect or dependency complaint under R.C. 2151.353(A)(4). *In re J.F.* at ¶ 44. In this case, the agency requested a disposition of permanent custody for L.G. and W.W. as part of its complaint. Therefore, R.C. 2151.353 applies in this case.

{¶ 52} Pursuant to R.C. 2151.353(A)(4), if a child has been adjudicated abused, neglected or dependent, the juvenile court may commit the child to the permanent custody of a public child services agency if the court determines that (1) the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent in accordance with R.C. 2151.414(E) and (2) that permanent custody is in the best interest of the child in accordance with R.C. 2151.414(D). *In re J.F.* at ¶ 48. With regard to the first requirement, i.e., determining whether a child cannot be placed with one of his or her parents within

a reasonable time or should not be placed with his or parents, the juvenile court must consider "all relevant evidence," including specific factors enumerated in R.C. 2151.414(E). If the juvenile court finds, by clear and convincing evidence, that at least one of the enumerated factors in R.C. 2151.414(E) exists as to each of the child's parents, the juvenile court "shall find" that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(E).

{¶ 53} Furthermore, R.C. 2151.353(I) prohibits a court from issuing "a dispositional order pursuant to [R.C. 2151.353(A)] that removes a child from the child's home unless the court complies with section 2151.419 of the Revised Code and includes in the dispositional order the findings of fact required by that section." R.C. 2151.419(A)(1) provides, in relevant part:

> Except as provided in division (A)(2) of this section,[10] at any hearing held pursuant to * * * 2151.353 of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency * * * that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal

---

[10] Under R.C. 2151.419(A)(2), the agency is not required to make reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the child's home and to return the child to the child's home if the parent from whom the child was removed has been convicted of or pleaded guilty to certain criminal offenses, has repeatedly withheld medical treatment or food from the child, has placed the child at substantial risk on more than one occasion because of alcohol or drug abuse and has rejected or refused to participate in treatment two or more times, has abandoned the child or has had parental rights involuntarily terminated with respect to a sibling of the child. There has been no claim that any of these circumstances existed here.

> of the child from the child's home, or to make it possible for the child
> to return safely home.

The agency bears "the burden of proving that it has made those reasonable efforts." R.C. 2151.419(A)(1). Where a court is required to make a reasonable efforts determination under R.C. 2151.419(A)(1), the court must issue written findings of fact (1) setting forth the reasons supporting its determination and (2) briefly describing the relevant services provided by the agency and why those services did not prevent removal of the child from the home or enable the child to return safely home. R.C. 2151.419(B)(1).

{¶ 54} In this case, as to the requirements of R.C. 2151.353(A)(4), the juvenile court found that R.C. 2151.414(E)(1) and (14) applied — i.e., that "[f]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home" and "[t]he parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect" — and that, therefore, L.J. and W.W. could not be placed with either of their parents within a reasonable time or should not be placed with either parent. The juvenile court

further found that granting permanent custody of L.G. and W.W. to CCDCFS was in the children's best interests.

{¶ 55} Mother does not specifically challenge the juvenile court's findings under R.C. 2151.414(E) or its determination that granting permanent custody of L.G. and W.W. to the agency was in their best interest. Rather, Mother argues only that the juvenile court's judgment should be reversed because its reasonable efforts determination at the permanent custody hearing was not supported by clear and convincing evidence.[11] The agency responds that the juvenile court was not required to make a reasonable-efforts determination at the permanent custody hearing because it had made reasonable efforts determinations in its orders granting predispositional temporary custody of the children to the agency and in its adjudication orders[12] and that, in any event, the juvenile court's reasonable efforts determination at the permanent custody hearing was supported by clear and convincing evidence.[13]

---

[11] Because Mother does not specifically challenge the juvenile court's best-interest determination or its findings under R.C. 2151.414(E), (E)(1) or (14), we do not specifically address those findings here. However, we recognize that that the juvenile court's finding under R.C. 2151.414(E)(1) includes a "reasonable efforts" component.

[12] In her brief, Mother addresses only the juvenile court's reasonable efforts determinations in its August 16, 2021 orders granting permanent custody of the children to the agency. She makes no mention of the reasonable-efforts determinations made in the orders granting predispositional temporary custody of the children to the agency order or the adjudication orders.

[13] R.C. 2151.419(A) does not specify the evidentiary standard of proof a public children services agency must satisfy in proving that it made reasonable efforts. Compare R.C. 2151.414 (requiring proof by clear and convincing evidence). Nevertheless, the parties appear to agree that CCDCFS bore the burden of proving reasonable efforts by

**{¶ 56}** "Clear and convincing evidence" is that "measure or degree of proof" that "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re M.S.*, 2015-Ohio-1028, at ¶ 8. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." (Emphasis deleted.) *Cross* at 477.

**{¶ 57}** "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.*; *see also In re S.B.*, 8th Dist. Cuyahoga Nos. 110016 and 110017, 2021-Ohio-1091, ¶ 22 ("In determining whether a juvenile court based its decision on clear and convincing evidence, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the degree of

---

clear and convincing evidence. Accordingly, we apply the same evidentiary standard when evaluating the juvenile court's reasonable-efforts determination here. *See, e.g., In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶ 75, citing *Risner v. Ohio Dept. of Natural Resources, Ohio Div. of Wildlife*, 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 28; *see also In re Shifflet*, 4th Dist. Athens No. 06CA13, 2006-Ohio-3576, ¶ 27 (public children services agency "bears the burden of proving its case, including the fact that it has made reasonable efforts with respect to [parents], by clear and convincing evidence"), citing *In re Schmidt*, 25 Ohio St.3d 331, 335, 496 N.E.2d 952 (1986), R.C. 2151.414(B)(1) and 2151.419(A)(1); *In re A.J.*, 6th Dist. Lucas No. L-10-1038, 2010-Ohio-4206, ¶ 36 (noting that all of the evidence "has to be factored into a determination as to whether [the agency] met its duty to make reasonable efforts to prevent the children from being removed from the home and its burden, pursuant to R.C. 2151.419(A)(1), to present clear and convincing evidence of that effort"); *In re S.B.*, 6th Dist. Lucas No. L-08-1453, 2009-Ohio-2290, ¶ 7 ("A trial court's reasonable efforts finding must be supported by clear and convincing evidence."); *In re Wayne Y.*, 6th Dist. Lucas No. L-07-1259, 2008-Ohio-245, ¶ 18 (same); R.C. 2151.414(E)(1).

proof."). "A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence 'if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence.'" *In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.[14]

{¶ 58} We note that this court has previously stated that a reasonable efforts determination is not required at a permanent custody hearing on a complaint for permanent custody under R.C. 2151.353(A)(4) when the record demonstrates a

---

[14] In her assignment of error, Mother asserts that the juvenile court committed "plain, reversible error." Mother, however, does not reference the plain-error standard of review and does not make a plain-error argument in her brief other than to assert, in her conclusion, that "[a]bsent clear and convincing evidence [reasonable] efforts were in fact made, the grant of permanent custody constitutes plain and reversible error." Plain error is limited to those "extremely rare cases" in which "exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a materially adverse effect on the character of, and public confidence in, judicial proceedings." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997); *see also In re E.C.*, 2020-Ohio-3807, 156 N.E.3d 375, ¶ 55 (8th Dist.). The error must be clearly apparent on the face of the record and must also be prejudicial to the appellant. *Goldfuss* at 121. Plain error exists only where the error "seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss* at 122-123; *see also In re C.T.*, 8th Dist. Cuyahoga No. 110303, 2021-Ohio-2274, ¶ 88.

Mother did not object to any of the multiple reasonable-efforts findings the juvenile court made below. Mother arguably could have asserted, at an earlier stage of the proceedings, that the agency had fallen short in its duty to make reasonable efforts to reunify the family, thereby giving the juvenile court an opportunity to consider her argument and address any deficiencies. *Cf. In re K.M.*, 4th Dist. Ross Nos. 19CA3677 and 19CA3678, 2019-Ohio-4252, ¶ 39. However, for the reasons set forth below, under either standard of review, we find no reversible error here.

reasonable efforts determination was made earlier in the proceedings. *In re N.R.*, 8th Dist. Cuyahoga No. 110144, 2021-Ohio-1589, ¶ 38, citing *In re A.R.*, 8th Dist. Cuyahoga No. 109482, 2020-Ohio-5005, ¶ 32. If the agency has not established that reasonable efforts have been made prior to the permanent custody hearing, then it must demonstrate such efforts at that time. *In re N.R.* at ¶ 38, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 43.

{¶ 59} We need not address that issue further here because, as detailed above, regardless of whether it was required to do so, the juvenile court made a reasonable efforts determination in its orders granting permanent custody of L.G. and W.W. to the agency. As to each child, the juvenile court found that the agency had made reasonable efforts to prevent the removal of the child from his home, to eliminate the continued removal of the child from his home or to make it possible for the child to return home. The juvenile court also set forth specific findings regarding the "reasonable efforts" made by the agency and the reasons those efforts were unsuccessful, as specified in R.C. 2151.419(B)(1). The juvenile court further found that "[f]ollowing the placement of the child outside the child's home and *notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home*, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." (Emphasis added.)

{¶ 60} In general, "reasonable efforts" mean "'[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed.'" *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). "'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.'" *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. In other words, the agency must use reasonable efforts to help remove the obstacles preventing family reunification. *In re C.B.C.*, 2016-Ohio-916, at ¶ 76, citing Bean, *Reasonable Efforts: What State Courts Think*, 36 U.Tol.L.Rev. 321, 366 (2005).

{¶ 61} In this case, Mother's mental health, substance abuse and lack of appropriate housing were the primary obstacles preventing Mother's reunification with L.G. and W.W. Mother contends that the juvenile court's reasonable efforts determination is not supported by clear and convincing evidence because, with respect to her mental-health issues (1) no evidence was presented that "any assessment" was ever undertaken of the effectiveness of Mother's mental-health counseling or Mother's engagement with the counseling she received from Empowering Integrated Care, (2) the agency never made any referrals for inpatient psychiatric treatment for Mother, (3) the agency did not develop "any sort of

individualized plan" that took into account whether Mother was making progress and (4) the agency did not set goals for Mother with respect to her mental health other than to attend therapy and take her prescribed medication. Mother further asserts that the agency did not make reasonable efforts to assist her in addressing her substance abuse and housing issues because (1) "no efforts were made to assist [Mother] in achieving and maintaining sobriety," e.g., she was not referred for drug or alcohol treatment, she was not required to attend A.A. or N.A. meetings and her last drug screen was in January 2020 — 20 months before trial, (2) "[n]o referrals or suggestions were made" to assist Mother in rectifying the issues with her home and (3) Mother was not told what "things she needed to fix" in her home.

{¶ 62} What constitutes "reasonable efforts" varies with the circumstances. *In re C.B.C.*, 2016-Ohio-916, at ¶ 76. "The issue in a reasonable-efforts determination is not whether the agency could have done more, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case." *In re A.F.*, 8th Dist. Cuyahoga No. 110503, 2021-Ohio-4519, ¶ 35. "'"Reasonable efforts" does not mean all available efforts.'" *In re J.B.*, 8th Dist. Cuyahoga No. 109039, 2020-Ohio-3675, ¶ 21, quoting *In re Lewis*, 4th Dist. Athens No. 03CA12, 2003-Ohio-5262, ¶ 16. "Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *Lewis* at ¶ 16; *In re K.W.*, 8th Dist. Cuyahoga No. 106700, 2018-Ohio-3314, ¶ 45 ("Whether an agency * * * made reasonable efforts pursuant to R.C. 2151.419 is based on the circumstances of each case, not whether

there was anything more the agency could have done."); *In re K.M.*, 12th Dist. Butler No. CA2004-02-052, 2004-Ohio-4152, ¶ 23 (In determining whether a public children services agency made reasonable efforts, "the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute."). In determining whether reasonable efforts were made, "the child's health and safety shall be paramount." R.C. 2151.419(A)(1).

{¶ 63} In this case, the record shows that CCDCFS made reasonable efforts to reunite Mother with L.G. and W.W. by implementing a workable case plan that included services to address concerns with Mother's ability to provide a safe and stable environment for the children. The evidence presented below demonstrates that CCDCFS provided substantial services to Mother and worked with Mother for more than two years in its efforts to reunite her with her children.[15]

{¶ 64} With respect to the efforts made to assist Mother in addressing substance abuse, although Mother claims in her brief that the agency failed to refer her for substance-abuse treatment, the record reflects that in Cuyahoga C.P. Juv. Nos. AD18909354 and AD18909354, involving N.G. and D.G., Mother admitted that she had previously been "engaged in services to address her substance abuse" and

---

[15] We note that the juvenile court, as part of its reasonable-effort determination, made a finding that the services provided by the agency included parenting classes and that "[M]other could not hold a job due to mental illness." Based on our review of the record, there appears to limited information supporting those findings. Although Bishop testified at the adjudication hearing that Mother could not "keep a job," she attributed that to Mother's substance abuse, not her mental-health issues. Mother, however, does not dispute these particular findings. Accordingly, we do not address them further here.

that she had "recently [re]engaged in treatment with Murtis Taylor" to address those issues. The agency was not required, when it refiled the complaint in this case, to start over with a completely new case plan, repeating the services that had previously been provided to Mother, in order to satisfy the reasonable-efforts requirement. *Cf. In re Wayne Y.*, 2008-Ohio-245, at ¶ 20-25 (Where agency had a history with father and the children, it "was not required to start at 'square one,' with a completely new case plan and reunification as a goal or to provide additional services to father in order to satisfy the reasonable efforts requirement. The 'reasonable efforts' extended back to 2005, when the agency first attempted to reunify the children with father.").

{¶ 65} The case plan required Mother to remain drug-free and to submit to random urine screens to confirm her sobriety. According to Bishop, Mother had last submitted to a urine screen in January 2020. It is unclear from the record whether the agency made a specific request of Mother to submit to a urine screen after January 2020. Although Bishop testified that Mother had been asked to submit to urine screens, the agency did not present evidence of specific dates when it had done so and Mother failed to comply. However, Mother admitted to Bishop in May 2021, that if she had been tested at that time, she would have tested positive for marijuana. As a general matter, a court is not entitled to deny an agency's request for permanent custody of a child solely because the agency failed to implement one aspect of a case plan. *Cf.* R.C. 2151.414(C) ("The court shall not deny an agency's motion for

permanent custody solely because the agency failed to implement any particular aspect of the child's case plan.").

{¶ 66} The record likewise does not support Mother's claim that the agency failed to make reasonable efforts to assist Mother in addressing her mental-health issues. The record reflects that although Mother had been receiving mental-health services for five years, she was not consistently engaging in mental-health services, was not medication compliant and had not sufficiently benefited from services to be able to properly care for her children. Certain of Mother's mental-health issues were exhibited during her emotional outbursts at the hearing on the agency's motion for predispositional temporary custody. After that hearing, Mother terminated her relationship with her long-time mental-health counselor — the only counselor with whom she had successfully engaged in many years. Although Mother told Bishop that she intended to reengage in mental-health services with another mental-health counselor at Empowering Integrated Care, there was no indication that Mother had done so.

{¶ 67} Mother contends that CCDCFS should have offered her additional or different counseling services if she was not demonstrating a sufficient benefit from the services provided. However, the record reflects that efforts to refer Mother to other mental-health counselors with greater experience in trauma therapy had proven unsuccessful because Mother had refused to engage in services with other counselors. Although Mother asserts that the agency should have referred her for inpatient psychiatric treatment, there is no evidence in the record that any mental-

health provider had recommended inpatient psychiatric treatment for Mother. Rather, the record reflects that Mother's mental health had been deteriorating because Mother was not medication compliant. The record further reflects that efforts were made to facilitate Mother taking her prescribed medication, including having Mother's medication delivered to her. *See, e.g., In re J.B.*, 2020-Ohio-3675, at ¶ 19-22 (rejecting mother's argument it was CCDCFS' responsibility to make additional referrals, and because it failed to do so, CCDCFS did not make reasonable efforts for reunification); *In re Nelson*, 2d Dist. Montgomery No. 19991, 2004-Ohio-268, ¶ 14 (rejecting argument that agency should have taken "a more proactive role" in monitoring mother's counseling progress and attendance and noting that "the [a]gency's purpose is to act as a guide" not "to force the mother to complete the case plan").

{¶ 68} Although Mother contends that "the agency did not set goals for Mother with respect to her mental health," the case plan clearly states that Mother's progress would be measured through Mother's "compliance with prescribed medication and providers['] recommendations," Mother's "ability to describe how symptoms caused her to have trouble meeting the needs of her children and how things are different now" and Mother's ability to "explain how she will continue managing her symptoms so she can meet her children's needs." In her written report, the guardian ad litem noted that during a January 29, 2021 CCDCFS staffing meeting in which Mother participated, the facilitator "explained" the "case plan and every aspect of which she was expected to finish" to Mother, including how Mother

needed to demonstrate that she had benefitted from services. The record further reflects that the agency was in regular contact with Mother's mental-health services provider and that the agency met with Mother regularly to evaluate Mother's progress with the elements of her case plan.

{¶ 69} The case plan also required that Mother allow the agency access to her home and provided that Mother's progress with the "household maintenance" aspect of her case plan was to be measured during monthly home visits to ensure that problem areas were rectified. As Bishop testified, however, after her May 11, 2021 visit, Mother refused to allow Bishop inside her home. Accordingly, the agency had no way of measuring Mother's progress with the case plan objectives. The agency cannot be faulted for failing to do more to assist Mother in rectifying the issues with the condition of her home when Mother refused to allow the agency access to her home.

{¶ 70} Following a thorough review of the record, we conclude that the agency complied with its obligations under R.C. 2151.419(A) and that the juvenile court's reasonable efforts findings are supported by clear and convincing evidence and not against the manifest weight of the evidence. Accordingly, Mother's assignment of error is overruled.

{¶ 71} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

ANITA LASTER MAYS, P.J., and
MARY EILEEN KILBANE, J., CONCUR