[Cite as *In re B.P.*, 2023-Ohio-1377.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

|                                     |     |                |
|-------------------------------------|-----|----------------|
| IN RE B.P., ET AL.                  | :   |                |
|                                     | :   | No. 112332     |
| Minor Children                      | :   |                |
|                                     | :   |                |
| [Appeal by S.P., Mother]            | :   |                |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 27, 2023

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD21907534, AD21908236, AD21908237,
AD21908238, AD21908239 and AD21908240

## *Appearances:*

Patrick S. Lavelle, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee* CCDCFS.

EILEEN T. GALLAGHER, J.:

{¶ 1} Appellant, Mother, appeals an order of the Cuyahoga County Court of Common Pleas, Juvenile Division (the "juvenile court"), granting permanent custody of her six children to appellee, the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). She claims the following errors:

1. The trial court's award of permanent custody to DCFS, despite DCFS's failure to make reasonable efforts to eliminate the continued removal of the children from their home and to return the children to their home violated state law and appellant's due process of law as guaranteed by the Fourteenth Amendment of the United State Constitution and Section 16, Article I of the Ohio Constitution.

2. The trial court's decision to award permanent custody to DCFS was against the manifest weight of the evidence.

3. The trial court's failure to discuss the wishes of the children and their relationship with Mother in determining the best interests of the children constitutes reversible error.

{¶ 2} We affirm the juvenile court's judgment.

## I. Facts and Procedural History

{¶ 3} On August 30, 2021, CCDCFS filed a complaint alleging that B.P., who was born five days earlier, was a dependent child. The complaint requested an order granting temporary custody of B.P. to the agency and set forth the following allegations:

1. Mother has five other children who were removed from her case [sic] and placed in the emergency pre-dispositional custody of CCDCFS. A complaint for abuse, neglect, and temporary custody to CCDCFS is pending. * * *

2. The home in which the family resides is unsanitary, inappropriate, and unsafe. The home is covered in trash, spoiled food, insects, and feces. The only toilet in the home is non-functional and is leaking biohazardous waste through the first floor ceiling.

3. Mother and father * * * have a domestically violent relationship. [Father] has threatened to kill mother and the child's siblings. Mother has continued to maintain a relationship with [Father] and had [sic] allowed him access to the children despite the ongoing violence.

4. Mother and [Father] fail to adequately supervise the child's siblings. Due to inadequate supervision, there is inappropriate sexual contact between the child's siblings.

5. [Father] has a prior conviction for aggravated criminal sex abuse, in which case the victim was under the age of thirteen. [Father] is required to register as a Tier III sex offender. * * * [Father] has several convictions for Failure to Register and Attempted Failure to Register. * * *

Following a hearing, the trial court granted the motion and placed B.P. in temporary custody.

{¶ 4} Less than one month later, on September 17, 2021, CCDCFS filed additional complaints alleging that Mother's five other children, C.P., Nat.P., Na'S.P., Ni.P., and No.P., were abused and neglected. With the filing of these complaints, the agency dismissed previously filed complaints for temporary custody of the five children that were not resolved within the required statutory time period. The five, nearly identical complaints reiterated the allegations set forth in the complaint in B.P.'s case regarding the unsanitary conditions of the home, the violent relationship between Mother and N.P., father of the five youngest of Mother's children, and inappropriate sexual conduct. In the prayers for relief, the agency requested an order placing the children in the agency's temporary custody. The five children identified in the complaints had previously been removed from Mother's home in June 2021, pursuant to an ex parte telephonic order. Following a hearing, the court adjudicated the children dependent and placed them in the agency's temporary custody.

{¶ 5} In May 2022, CCDCFS filed motions in each of the children's cases seeking to modify temporary custody to permanent custody. Trial on the motions commenced in November 2022. Jason Vicens ("Vicens"), a supervisor with

CCDCFS assigned to the case, testified that the agency developed a case plan for Mother that provided services for mental-health and substance-abuse evaluations and treatment as well as domestic violence and parenting education. (Tr. 63.)[1] The case plan also provided services aimed at helping Mother obtain suitable housing. (Tr. 63.)

{¶ 6} Vicens explained that although Mother completed domestic violence and parenting education, she did not appear to benefit from those programs. Mother completed domestic-violence education at Able Counseling in February 2022. However, after completing the program, she continued her relationship with N.P., who had physically and sexually abused her and the children. (Tr. 65.) Although Mother legally divorced N.P., the agency did not find the divorce "genuine" because case workers repeatedly observed Mother and N.P. together after their divorce. (Tr. 69, 82.) Vicens stated, "I've also personally seen them together at a visit when I showed up unannounced." (Tr. 69-70.)

{¶ 7} Mother also completed parenting services through Catholic Charities, but she continued to blame the children for the family's involvement with CCDCFS. Vicens noted that Mother failed to take responsibility for her own role creating the conditions that caused the removal of the children. (Tr. 64.)

{¶ 8} With respect to the mental-health component of the case plan, Vicens explained that Mother was referred to the Juvenile Court Diagnostic Clinic because

---

[1] Unless otherwise noted, citations to the transcript refer to the transcript of the hearing held on November 3, 2022.

she self-reported that she had schizophrenia. Dr. Douglas Waltman ("Dr. Waltman"), a psychologist with the Juvenile Court Diagnostic Clinic, completed a psychological evaluation of Mother. Dr. Waltman testified that despite extensive testing, he found no significant mental issues with Mother. He did, however, conclude that Mother lacks insight into her own behavior and sees herself as fine when in fact she is not. (Tr. 42.) For example, Mother knew that her husband, N.P., was a convicted sex offender, but she did not believe it was a valid conviction. (Tr. 40.) She also held the opinion that the CCDCFS cases concerning her children were "entirely unwarranted." (Tr. 39.)

{¶ 9} Dr. Waltman explained that people like Mother, who lack insight into themselves, "have a tendency to not take responsibility for their actions." (Tr. 42.) As an example, Dr. Waltman testified that Mother provided excuses as to why her home was in disarray. He also explained that Mother views herself as an innocent victim of CCDCFS. (Tr. 42-43.)

{¶ 10} Vicens testified that housing was a component of Mother's case plan because she and the children were living in "deplorable conditions" when the children were removed. He stated:

> Upon investigation, the home was found to have garbage, diapers, a large amount of flies/insects, [a] broken front door window, a bunch of spindles missing from the stairs, [and] feces smeared on the wall.
>
> The toilet from upstairs was so not properly working that it was leaking through the ceiling.
>
> Also the children's bedding was not appropriate in terms of cleanliness. So there was a lot of issues with the condition of the home.

(Tr. 66.)  Although Mother was afforded services to help her remedy problems in the home or to otherwise obtain suitable housing, Mother refused to allow Vicens access to the house for an inspection.  (Tr. 67.)  Vicens explained:

> I know I've attempted to see the * * * home on at least four occasions throughout the life of the case, most recently this past summer which once again I didn't get access to, and prior to that was in February 2022 which I did not get access, but upon going to the home there was at least 10 to 14 bags of trash next to the porch in various stages of decomposition in terms of discarded food, but also beer and liquor bottles that I observed.

(Tr. 67.)  Therefore, Vicens was unable to say that Mother had remedied the conditions in the home that contributed to the children's removal.

{¶ 11} Vicens testified that he referred Mother for a drug and alcohol ("AOD") assessment through Moore Counseling after she tested positive for cocaine on a five-panel hair follicle test in September 2021.  (Tr. 84.)  Mother never completed the AOD assessment.  According to Vicens, Mother blamed the positive drug-test result on the fact that she kissed N.P. on the lips.  (Tr. 84.)  Vicens was concerned that Mother was minimizing the seriousness of her substance-abuse problem and the fact that she continued a romantic relationship with someone who was using illegal substances.  (Tr. 84.)

{¶ 12} As previously stated, N.P. is the father of Mother's five youngest children.  J.G. is the father of C.P.  N.P., father of Mother's youngest five children, did not engage in any of the services offered as part of his case plan.  (Tr. 68-69.)  He also failed to verify a residence that could be investigated by CCDCFS.  (Tr. 68-69.)  According to Vicens, C.P.'s father, J.G., is mentally disabled and is unable to take

custody of C.P. (Tr. 72.) Indeed, J.G.'s brother has been appointed to serve as J.G.'s guardian. (Tr. 72.)

{¶ 13} C.P. was placed in a residential treatment facility due to her particularized needs and behaviors. (R. 291, GAL report.) Laurie Nagle ("Nagle"), C.P.'s therapist at Genacross Family and Youth Services, testified that C.P. has been undergoing both individual and group therapy to address anxiety related to her history of sexual and physical abuse. (Tr. 16.) C.P. reported to Nagle that her stepfather, N.P., raped her multiple times over a period of years before she was removed from Mother's custody when she was 14 years old. (Tr. 16-18.) C.P. told Mother about the rapes multiple times, and Mother put a lock on C.P.'s bedroom door to keep her safe. (Tr. 19.) There was no evidence that Mother reported the rapes to police or that she took any other action.

{¶ 14} C.P. disclosed to Nagle that she witnessed N.P. performing oral sex on her youngest sister and that N.P. whipped her younger brothers and sisters with a belt many times. (Tr. 19.) C.P. also observed N.P. attempt to choke Mother and forced Mother to perform oral sex on him. (Tr. 20.) Although C.P. now lives in a residential treatment facility, she fears that N.P. will show up with a gun and rape her. (Tr. 21.)

{¶ 15} Felicia Croston ("Croston"), a licensed social worker with National Youth Advocates Program, testified that she is Na'S.P.'s therapist. Na'S.P. was five years old at the time of trial. (Tr. 52.) Croston testified that she was helping Na'S.P. "learn to deal with the trauma, sexual, and physical abuse from her parents." (Tr.

50.) Na'S.P. reported to Croston that N.P., whom she refers to as her "old dad," hit, pinched, and slapped her. She also reported that Mother touched her vagina and stuck a plastic knife in her vagina. (Tr. 52-53.) Na'S.P. further disclosed that N.P. also sexually abused her. (Tr. 53.) Vicens testified that Na'S.P. refused to visit her parents. Vicens stated:

> [Na'S.P.] has been adamant from day one that she does not want to visit with her parents to the point of, you know, shutting down or being very clingy with the foster parent prior to visits, and also showing concern for her siblings to go to visits.

(Tr. 72.)

{¶ 16} When asked about visitation with the other children, Vicens stated that Nat.P., No.P., Ni.P., and B.P. visited with Mother. The children, who all suffer from asthma, were living in two different foster homes. According to Vicens, both foster families reported that the children had increased breathing difficulties that required additional treatments after visits that were not normally required. (Tr. 92.) Vicens explained that the visits exacerbated their breathing difficulties to the point that the children's doctor wanted to stop the visits. (Tr. 93.) Vicens explained that because all the children experienced exacerbation of their breathing difficulties following visits and the children live in two different homes, the problem does not originate in the homes but with the visits themselves. (Tr. 93.) Both foster families also reported that the children were clingy after the visits. (Tr. 91.)

{¶ 17} In separate journal entries, the juvenile court granted the agency's motion to modify custody and ordered that all of Mother's children be placed in the

agency's permanent custody. The court also found, by clear and convincing evidence, that returning custody of the children to either of their parents would be contrary to the children's best interests. Mother now appeals the juvenile court's judgment.

## II. Law and Analysis

### A. Reasonable Efforts at Reunification

{¶ 18} In the first assignment of error, Mother argues that the juvenile court failed to make adequate findings relating to the agency's reasonable efforts to reunify her with the children pursuant to R.C. 2151.419.

{¶ 19} This court addressed the first issue in Mother's argument in *In re C.N.*, 8th Dist. Cuyahoga No. 81813, 2003-Ohio-2048, wherein we explained:

> R.C. 2151.419 requires the court to determine whether the public children services agency that filed the complaint in the case has made reasonable efforts to make it possible for the child to return safely home. However, that statute applies only to hearings held pursuant R.C. 2151.28, division (E) of R.C. 2151.31, R.C. 2151.314, R.C. 2151.33 or R.C. 2151.353. The motion for permanent custody in this case was filed pursuant to R.C. 2151.413. Therefore, the reasonable efforts demonstration is not required in the instant permanent custody analysis.

*Id.* at ¶ 37. *See also In re I.A.-W.*, 8th Dist. Cuyahoga No. 111217, 2022-Ohio-1766, ¶ 17 (juvenile court is not required to make a reasonable-efforts determination when it was ruling on a motion for permanent custody); *In re Baby Boy M.*, 8th Dist. Cuyahoga No. 91312, 2008-Ohio-5271, ¶ 41 (same).

{¶ 20} Mother concedes existing precedent from this court holds that reasonable-efforts findings are not required in permanent custody cases but argues

that this court's precedent misinterprets the law. However, the Ohio Supreme Court has also held that a juvenile court is not required to make a reasonable-efforts determination when ruling on a motion for permanent custody. In *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, the Ohio Supreme Court explained:

> By its terms, R.C. 2151.419 applies only at hearings held pursuant to R.C. 2151.28, 2151.31(E), 2151.314, 2151.33 or 2151.353. *See* R.C. 2151.419(A)(1). These sections involve adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state. The statute makes no reference to a hearing on a motion for permanent custody. Therefore, "[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414." *In re A.C.*, supra, 2004-Ohio-5531, ¶ 30.
>
> This does not mean that the agency is relieved of the duty to make reasonable efforts. At various stages of the child-custody proceeding, the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification. To the extent that the trial court relies on R.C. 2151.414(E)(1) at a permanency hearing, the court must examine the "reasonable case planning and diligent efforts by the agency to assist the parents" when considering whether the child cannot or should not be placed with the parent within a reasonable time. However, the procedures in R.C. 2151.414 do not mandate that the court make a determination whether reasonable efforts have been made in every R.C. 2151.413 motion for permanent custody.
>
> Therefore, we hold that R.C. 2151.419(A)(1) does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413. However, except for some narrowly defined statutory exceptions, the state must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights. If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time.

*Id*. at ¶ 41-43.

{¶ 21} The juvenile court in this case previously determined that the agency had made reasonable efforts to prevent removal of the children from Mother's home when it granted predispositional temporary custody of the children to CCDCFS. In separate journal entries dated September 20, 2021, the court found, in relevant part:

> The Court further finds that reasonable efforts were made to prevent the removal of the child from the home. Relevant services provided to the family and the reasons those services were not successful: Mother was referred to Murtis Taylor and Catholic Charities and Court's Diagnostic Clinic.
>
> Father has been linked with Beech Brook for parenting education. Father was referred for hair follicle testing and possible domestic violence education.

Thereafter, Mother appeared with counsel for an adjudicatory hearing in December 2021. At that time, Mother stipulated to the allegations of the complaint, as amended, and the children were adjudged to be dependent and placed in the temporary custody of the agency. In separate journal entries, the court made relevant findings similar to the following:

> The Court finds that the Cuyahoga County Division of Children and Family Services has made reasonable efforts to prevent removal of the child, to eliminate the continued removal of the child from the home, or to make it possible for the child to return home. The case specific findings are:
>
> Mother's case plan objectives are parenting education, domestic violence education, substance abuse and basic needs. The parents, on their own, went to Beech Brook for parenting education. Supportive visits have started. There is a parenting coach through Beech Brook. Domestic violence education services are being sought through Catholic Charities or Beech Brook. Mother was referred to Moore Counseling for substance abuse for cocaine.

Father's case plan objective are parenting education, domestic violence education and substance abuse. A referral was made for domestic violence education. A drug screen needs to be completed.

The child is participating in counseling.

(R. 131, AD21907543.) The trial court also issued a journal entry in each child's case on July 5, 2022, explicitly finding that "CCDCFS has made reasonable efforts to finalize a permanency plan. Those efforts include: substance abuse, parenting, domestic violence, mental health, and housing." (R. 224, AD21907543; R. 235, AD21908236; R. 170, AD21908237; R. 165, AD21908238; R. 165, AD21908239; R. 169, AD21908240.)

{¶ 22} None of these findings were challenged by way of objection or appeal. Therefore, because the trial court made reasonable-efforts findings during the pendency of these cases before the permanent-custody proceedings, the requirements of R.C. 2151.419 were satisfied. Moreover, despite Mother's argument to the contrary, the court also made the following reasonable-efforts findings in each of the judgment entries granting the agency's motion for permanent custody:

> The Court further finds that reasonable efforts were made to prevent the removal of the child from her home, or to finalize the permanency plan, to wit: reunification. Case plan services for mother include mental health, domestic violence, and housing. Mother completed a mental health assessment at the diagnostic clinic. Mother completed parenting classes, however has not benefited from those services. Mother completed domestic violence through Able Counseling, but has not benefited from those services. It is unknown if Mother has housing. The Father never engaged in case plan services.
>
> * * *
>
> The Court further finds that following the placement of the child outside the child's home and notwithstanding reasonable case planning

and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

Therefore, the juvenile court not only complied with the requirements of R.C. 2151.419 in its journal entries granting temporary custody of the children to the agency, it also made reasonable-efforts findings in its final judgment entries granting permanent custody of the children to the agency even though it was not required to do so. We discuss the evidence supporting those findings in our analysis of the second assignment of error. Accordingly, the first assignment of error is overruled.

## B. Manifest Weight of the Evidence

{¶ 23} In the second assignment of error, Mother argues the trial court's decision to award permanent custody of her children to CCDCFS was against the manifest weight of the evidence. Mother contends the evidence demonstrates that she remedied the conditions that caused the children to be removed because she (1) divorced N.P. and there was nothing more she could do to protect her children, (2) complied with all case plan requirements, (3) regularly visited the children and demonstrated a bond with them, and (4) removed the dangers that caused the children to be removed from her care in the first place.

{¶ 24} A parent has a "fundamental liberty interest * * * in the care, custody, and management of [his or her child]." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The termination of parental rights is regarded as

"'the family law equivalent of the death penalty in a criminal case.'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14. Consequently, parents "'must be afforded every procedural and substantive protection the law allows.'" *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991).

{¶ 25} Nevertheless, a parent's right to the care and custody of his or her child is not absolute. *In re L.G.*, 8th Dist. Cuyahoga No. 110789, 2022-Ohio-529, ¶ 49. "'[T]he natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principal to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 26} Ohio statutes governing child custody and protection "appropriately reflect the need to balance * * * [the] parents' * * * interest in the custody, care, nurturing, and rearing of their own children, and the state's parens patriae interest in providing for the security and welfare of children under its jurisdiction[.]" *In re Thompson*, 10th Dist. Franklin No. 00AP-1358, 2001 Ohio App. LEXIS 1890 (Apr. 26, 2001).

### 1. Standard of Review

{¶ 27} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, 115 N.E.3d 813, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). This first prong authorizes

the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.  R.C. 2151.414(B)(1)(a)-(e).

{¶ 28} Only one of the factors listed in R.C. 2151.414(B)(1)(a)-(e) must be established to satisfy the first prong of the two-part analysis for granting permanent custody of a child to a child-protection agency.  *In re D.H.*, 8th Dist. Cuyahoga No. 110505, 2021-Ohio-3821, ¶ 27, citing *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657.  If any one of the factors listed in R.C. 2151.414(B)(1)(a)-(e) is established, the court may move to the second prong of the analysis, which requires the juvenile court to determine, by clear and convincing evidence, whether it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).

{¶ 29} "A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence 'if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence.'" *In re G.W.,* 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.,* 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

{¶ 30} "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re T.B.,* 8th Dist. Cuyahoga No. 99931, 2014-Ohio-2051, ¶ 28, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

## 2. First Prong: R.C. 2151.414(B)(1)(a)-(e)

{¶ 31} With respect to the first prong of the permanent-custody analysis, the juvenile court found, pursuant to R.C. 2151.414(B)(1)(a), that the children were neither abandoned nor orphaned, but they could not be placed with either parent within a reasonable time or should not be placed with their parents.

{¶ 32} When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E). *In re A.V.,* 8th Dist. Cuyahoga No. 101391, 2014-Ohio-5348, ¶ 58; *In re R.M.,* 8th Dist. Cuyahoga Nos. 98065 and 98066, 2012-Ohio-4290, ¶ 14; *In re B.P.,* 8th Dist. Cuyahoga Nos. 107732 and 107735, 2019-Ohio-2919, ¶ 13. A juvenile court is only required to find that one of these factors is met in order to

properly find that a child cannot or should not be placed with a parent. *In re Ca.T.*, 8th Dist. Cuyahoga No. 108969, 2020-Ohio-579, ¶ 27, citing *In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, ¶ 42.

{¶ 33} The juvenile court found that the children could not be placed with either parent within a reasonable time or should not be placed with either parent pursuant to R.C. 2151.414(E)(1). R.C. 2151.414(E)(1) provides that the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent if it finds that

> [f]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

{¶ 34} Vicens testified that although Mother engaged in parenting and domestic-violence education programs, she failed to benefit from those services. (Tr. 63-64.) As an example, Vicens explained that although Mother completed parenting classes through Catholic Charities, she continued to blame the children for the family's involvement with CCDCFS. Vicens stated that Mother "was minimizing and projecting blame on others for involvement with DCFS." (Tr. 64.)

{¶ 35} Dr. Waltman's testimony corroborates Vicens's opinion. Referring to Mother's involvement with CCDCFS, he explained that "she portrays herself as being an innocent victim, that the case against her from Children's Services is unwarranted." He further explained, "She had explanations for why the home was

unkempt and basically did not take responsibility for any of the concerns that Childrens Services had." (Tr. 42-43.)

{¶ 36} Although Mother completed the domestic-violence component of her case plan and divorced N.P., she continued her relationship with him even though he physically and sexually abused her and the children. (Tr. 65-66.) Indeed, a CCDCFS's worker observed Mother with N.P. together two days prior to trial. (Tr. 65-66.)

{¶ 37} Mother's case plan also required her to provide suitable housing for the children. At the time the children were removed from her care, Mother's house was in a "deplorable" condition. (Tr. 66.) Throughout the pendency of the case, Mother never allowed Vicens to inspect the house. Vicens testified that he visited the exterior of the house and observed "at least 10 to 14 bags of trash next to the porch in various stages of decomposition in terms of discarded food, but also beer and liquor bottles[.]" (Tr. 67.) The guardian ad litem ("GAL"), Christina M. Joliat ("Joliat"), also stated in her report that the "children were found in deplorable home conditions and even without the children present [Mother] is unable to maintain appropriate housing." (GAL Report.) Therefore, the record contains competent, credible evidence supporting the juvenile court's finding that "notwithstanding reasonable case planning and diligent efforts by the agency to assist the parent to remedy the problems that initially caused the child[ren] to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." Therefore, the

juvenile court properly concluded that the children could not or should not be placed with Mother within a reasonable time pursuant to R.C. 2151.414(B)(1)(a).

### 3. Second Prong: Best Interests of the Children

{¶ 38} Having determined that the manifest weight of the evidence supports the juvenile court's finding that the children could not or should not be returned to either parent within a reasonable time, we now turn to the second prong of our analysis, which requires the court to determine, by clear and convincing evidence, whether it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).

{¶ 39} We recognize that, given the nature of the proceeding and the impact the court's decision will have on the lives of the parties concerned, the juvenile court enjoys broad discretion in determining whether an order of permanent custody is in the child's best interest. *In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist.1994). We, therefore, review a juvenile court's determination of a child's best interests under R.C. 2151.414(D) for an abuse of discretion. *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47.

{¶ 40} An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. This court has held that an abuse of discretion may be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401,

2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.). When applying the abuse-of-discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Vannucci v. Schneider*, 2018-Ohio-1294, 110 N.E.3d 716, ¶ 22 (8th Dist.).

{¶ 41} R.C. 2151.414(D) provides two alternative tests for determining whether permanent custody is in a child's best interest. "'Under R.C. 2151.414(D)(1), the juvenile court weighs multiple factors * * * to decide whether granting an agency permanent custody of a child is in that child's best interest.'" *In re S.C.*, 10th Dist. Franklin No. 21AP-203, 2022-Ohio-356, ¶ 38, quoting *In re J.P.*, 10th Dist. Franklin No. 18AP-834, 2019-Ohio-1619, ¶ 39. "By contrast, 'under R.C. 2151.414(D)(2), if the juvenile court makes [each of] the four enumerated findings, permanent custody is per se in the child's best interest and the court "shall" commit the child to the permanent custody of the agency.'" *Id.*, quoting *In re J.P.* at ¶ 39.

{¶ 42} In this case, the juvenile court applied R.C. 2151.414(D)(1), which requires the court to consider all relevant factors, including but not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents, and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors in R.C. 2151.414(E)(7) through (11) are applicable.

{¶ 43} Although a trial court is required to consider each of the R.C. 2151.414(D)(1) factors in making its permanent-custody determination, "there is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. And, only one factor needs to be resolved in favor of permanent custody in order to find that permanent custody is in the child's best interest. *In re S.C.*, 8th Dist. Cuyahoga No. 102350, 2015-Ohio-2410, ¶ 30. Moreover, the Ohio Supreme Court has clarified that R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶ 31. "Consideration is all the statute requires." *Id.*

{¶ 44} The journal entries granting permanent custody of the children to the agency in this case state that the court considered

> the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster parents; the wishes of the child; the custodial history of the child, including whether the child has been the temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period; the child's need for legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and, the report of the Guardian ad Litem[.]

(R. 263, AD21908240.)

{¶ 45} The court's journal entry establishes that the court considered the factors set forth in R.C. 2151.414(D)(1), and evidence in the record supports the court's conclusion that permanent custody is in the children's best interests. With

respect to the interaction and interrelationship of the children with their parents, siblings, relatives, and foster parents, several witnesses testified that C.P. and Na'S.P., two of the older children, refused to visit with their parents because they were afraid of them as a result of prior physical and sexual abuse. (Tr. 21, 26, 52, 55, 72.) The GAL also noted that C.P. and Na'S.P. were fearful of their parents and refused to visit them. The other four children had visits with Mother, but they displayed regressive behaviors after visits and their breathing issues were noticeably exacerbated by the visits. (Tr. 72-75, 91-95, 112.) Thus, this factor weighed in favor of permanent custody because the children were clearly not comfortable visiting their parents.

{¶ 46} R.C. 2151.414(D)(1)(b) requires consideration of the child's wishes as expressed directly or through a GAL. At the time of trial, the children were 16, 6, 4, 3, 2, and 1 year old. Thus, the five youngest children lacked the capacity to express their wishes in a meaningful fashion. The oldest child, C.P., is a "highly autistic child with ADHD." (Tr. 20, 70.) C.P.'s therapist testified that C.P. refuses to speak to Mother, does not want to have contact with her, and does not want to go home with her. (Tr. 26.) The GAL notes in her written report that Na'S.P. "continues to refuse to visit and has made disclosures regarding abuse by [Mother, N.P., and C.P.]." She also states that C.P. has refused all contact with Mother due to her continued relationship with N.P. (Tr. 291, AD21908236.) And, based on her investigation, the GAL recommended to the court that it grant permanent custody of the children to CCDCFS.

{¶ 47} R.C. 2151.414(D)(1)(c) requires consideration of the children's custodial history, including whether the child has been in temporary custody for 12 or more months of a consecutive 22-month period. R.C. 2151.414(D)(1) provides, that for purposes of R.C. 2151.414(D)(1),

> a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

{¶ 48} The oldest five children were removed from Mother's custody pursuant to an ex parte telephonic order on June 23, 2021. The youngest child, B.P., was removed by another ex parte telephonic order on August 28, 2021, three days after his birth. The permanent custody trial began on November 7, 2022. Therefore, the children were in temporary custody for over 12 months of a consecutive 22-month period at the time of trial.

{¶ 49} Finally, R.C. 2151.414(D)(1)(d) requires the court to consider the child's need for a legally secure placement and whether such placement can be achieved without a grant of permanent custody. As previously stated, the juvenile court found that the children "cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent." If the juvenile court finds by clear and convincing evidence that at least one of the enumerated factors in R.C. 2151.414(E) exists as to each of the child's parents, the juvenile court must find that the child cannot or should not be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(E).

{¶ 50} The juvenile court found, pursuant to R.C. 2151.414(E)(1), that after the children were placed in temporary custody and notwithstanding reasonable planning and diligent effort by the agency to assist the parents to remedy the problems that caused the child to be placed outside the home, the parents "failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." (R. 263, AD21908240.) And, as previously stated, this finding is supported by competent, credible evidence. Having found that one of the enumerated factors in R.C. 2151.414(E) exists as to each of the child's parents, the juvenile court had to find that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(E).

{¶ 51} None of the parents filed any motions suggesting that an alternative caregiver might be available for any of the children. Vicens testified that the agency attempted to find relatives who might qualify to serve as alternative caregivers for the children, but those efforts were not successful. (Tr. 76-78, 83, 88-89.) Moreover, the GAL testified that the children were doing well in their foster homes and that C.P. was progressing in her group home. (Tr. 111.) Again, the GAL recommended that the children be placed in permanent custody.

{¶ 52} Based on the evidence presented, we cannot say that the juvenile court acted unreasonably, arbitrarily, or unconscionably in determining that permanent custody was in the children's best interests. We, therefore, overrule the second assignment of error.

## C. The Children's Wishes

{¶ 53} In the third assignment of error, Mother argues the trial court erred in failing to discuss the children's wishes and their relationships with their parents in the judgment entries granting permanent custody of the children to CCDCFS. However, as previously stated, "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶ 31. *See also In re M.S.K.*, 8th Dist. Cuyahoga No. 111974, 2023-Ohio-316 (same).

{¶ 54} The juvenile court's journal entries granting permanent custody expressly state that the court considered the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). And, as discussed in our analysis of Mother's second assignment of error, the evidence adduced at the permanent custody trial clearly and convincingly supports the juvenile court's findings. Therefore, the third assignment of error is overruled.

{¶ 55} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

LISA B. FORBES, P.J., and
MICHAEL JOHN RYAN, J., CONCUR