[Cite as *In re A.P.*, 2024-Ohio-1283.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE A.P., ET AL.         :

                      :

Minor Children         :

                      :

[Appeal by Mother, S.K.,     :
and by Father, J.K.]

Nos. 113227 and 113230

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 4, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-21905170, AD-21905171, AD-21905172, and AD-22903088

---

### *Appearances:*

Judith M. Kowalski, *for appellant* S.K.

Brian A. Smith Law Firm, LLC, and Brian A. Smith, *for appellant* J.K.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Zachary J. LaFleur, Assistant Prosecuting Attorney, *for appellee.*

LISA B. FORBES, J.:

{¶ 1} S.K. ("Mother"), mother of A.P., R.J., I.J., and J.K., and J.K. Sr., Father of J.K. ("Father A"), appeal the juvenile court's orders terminating their

parental rights and awarding permanent custody of their respective minor children to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or the "Agency"). After reviewing the facts of the case and the pertinent law, we affirm the juvenile court's order.

## I. Procedural History

{¶ 2} A.P. was born on September 14, 2017; R.J. was born September 11, 2019; and I.J. was born October 3, 2020 (collectively "the Older Children"). CCDCFS filed a complaint on June 16, 2021, alleging that A.P. and R.J. were abused and that I.J. was dependent. CCDCFS was granted emergency temporary custody of the Older Children on August 27, 2021.

{¶ 3} Mother stipulated to the following pertinent allegations in the amended complaint: "A.P. and R.J. have suffered injuries while in mother's custody. The mother has been unable to provide any explanation for the injuries to A.P. Mother resides with her husband, and both of them had access to the children at the time of the injuries. Due to the injuries to A.P and R.J., child I.J. is at risk in mother's care * * *."

{¶ 4} A.P. and R.J. were adjudicated abused and I.J. was adjudicated dependent on November 3, 2021. At that time, all three were committed to CCDCFS's temporary custody.

{¶ 5} J.K. was born on March 10, 2022. CCDCFS filed a complaint on March 25, 2022, alleging that J.K. was neglected and dependent. Mother and

Father A stipulated to the following allegations included in CCDCFS's May 23, 2022 amended complaint:

> Mother needs to maintain stable housing in which she can provide appropriate care to the child. Mother and Father [A] need to demonstrate the judgment and decision skills necessary to provide safe and appropriate care to the child. Mother and Father [A] have a domestically violent relationship. Mother and Father [A] must complete and benefit from DV services. Mother's three older children were adjudicated abused and dependent, due in part to Mother's lack of appropriate parenting judgment. They are currently placed in the temporary custody of CCDCFS. * * * Mother has pending charges for aggravated burglary, felonious assault, and criminal damaging. * * *. Father [A] was incarcerated. He was released May 8, 2022. Father [A] has convictions for domestic violence, attempted felonious assault, assault, and attempted disrupting public service. Mother is the listed victim for one of the domestic violence counts. * * *.

{¶ 6} J.K. was adjudicated neglected and dependent on June 16, 2022. On July 28, 2022, J.K. was committed to CCDCFS's emergency temporary custody. CCDCFS was granted temporary custody on August 16, 2022.

{¶ 7} CCDCFS filed motions to modify temporary custody to permanent custody of the Older Children on December 19, 2022, and of J.K. on February 13, 2023. The juvenile court held a dispositional hearing on CCDCFS's motions on August 30, 2023 ("the Hearing").

{¶ 8} On September 14, 2023, the court journalized entries terminating Mother's and Father A's parental rights and granting permanent custody of A.P., R.J., I.J., and J.K. (collectively "the Children") to CCDCFS. It is from these orders that Mother and Father A appeal raising the following assignments of error:

**Mother's Assignments of Error**

I. The Cuyahoga County juvenile court erred and abused its discretion in finding that clear and convincing evidence supported granting permanent custody of the subject children to [CCDCFS].

II. The trial court erred in granting permanent custody as [CCDCFS] did not make reasonable efforts to reunify the family prior to seeking permanent custody.

**Father A's Assignments of Error**

I. The trial court's ruling in case number AD22903088, granting Appellee's Motion to Modify Temporary Custody to Permanent Custody, was not supported by clear and convincing evidence.

II. The trial court erred, by clear and convincing evidence, in holding, in case number AD22903088, that Appellee used "reasonable efforts and diligent case planning by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home," with respect to [Father A].

## II. Dispositional Hearing

{¶ 9} At the Hearing, the court heard testimony from two police officers who responded to domestic-violence calls involving Mother and Father A, two CCDCFS employees who worked with the family, Mother, and Father A's mother ("Grandmother"). The Children's guardian ad litem Paul Berman ("GAL") submitted a written report and gave a recommendation on the record at the Hearing. The juvenile court also heard statements from the Older Children's caregivers. In addition, several exhibits were admitted into evidence. The following evidence was presented at the Hearing.

### A. Officer Lagasse

{¶ 10} Officer Lagasse ("Off. Lagasse") is a police officer with the Akron Police Department. On June 14, 2023, Off. Lagasse "was dispatched to [Mother's] apartment on Cromwell" for "a domestic violence incident." When Off. Lagasse arrived, Mother "came out of the apartment, explained to [him] that she had been involved in a domestic situation where she had been in an argument with her husband [Father A], who had cho[k]ed her around the neck." Mother's neck was red and had "a little scratch on it" according to Off. Lagasse. Mother indicated that she wished to press charges, and Father A was arrested.

{¶ 11} A complaint was prepared for Mother to sign once Mother and police officers arrived at the police station. However, Mother "recanted her story and said that she had lied about the incident and that [Father A] had never touched her." When asked why she lied, Off. Lagasse recalled Mother stating "that she wanted [Father A] to leave. All she wanted him to do was leave."

{¶ 12} At that point, Off. Lagasse took Mother to talk "to a Victim Assistance advocate about getting a protection order" against Father A. Off. Lagasse recalled that Mother obtained a protection order against Father A that day.

### B. Officer Crawford

{¶ 13} Officer Crawford ("Off. Crawford") is a police officer with the Akron Police Department. On July 4, 2023, Off. Crawford was dispatched to Mother's apartment. "As I arrived on scene, * * * I met with [Mother], saw that she had like a visible injury to her head. She was holding like a washcloth of some sort up to her

head where she had been bleeding." When Off. Crawford asked Mother what happened, Mother responded that Father A "was over and they had an argument. During the argument inside the house, she was in the bathroom, he was near the doorway of the bathroom, threw a bottle of cologne at her and hit her in the head." Off. Crawford went inside to ensure Father A was not there. Once inside, Off. Crawford saw "that there was blood on the bathroom floor, a red aerosol cologne bottle matching, everything that [Mother] had described." Mother did not want to press charges for this incident but was "willing to fill out a Victim Statement form." Off. Crawford "signed charges on her behalf" based on "[t]he written statement, the verbal statement * * *, the scene inside the residence, and the * * * visible injury to the top of her head and hairline area."

### C. Melanie Green

{¶ 14} Melanie Green ("Green") is an "Ongoing Worker in the START Department" for CCDCFS. Green was assigned to work on Mother's case in May 2021; however, at the time of the Hearing, she was no longer the assigned worker. According to Green, her "assignment ended on or about June of 2023 due to a safety factor."

{¶ 15} Green testified that during the pendency of this case, Father A was incarcerated three times: November 2021 to May 2022; August 2022 to February 6, 2023; and finally, from July 2023 through the date of the Hearing.

### 1. CCDCFS's Involvement With the Children

{¶ 16} According to Green, CCDCFS became involved with Mother because it "received an intake alleging that mom had given birth to [I.J.] and that the child was positive at birth for marijuana" on October 9, 2020. As a result, CCDCFS began to work "with the family to try to address" its concerns; CCDCFS did not immediately seek court involvement. After CCDCFS became involved, Mother went "MIA * * * in November of 2020, and did not resurface until May of 2021." I.J. and R.J.'s father ("Father B") cared for the Older Children at that time.

{¶ 17} Mother reentered the Older Children's lives on May 19, 2021. CCDCFS received a call from the police that Mother was attempting to pick up the Older Children from Father B's home for a weekend visit. CCDCFS informed police that Mother "is still the custodian of these three children, and she's * * * free to go with them." The Older Children spent the weekend with Mother.

{¶ 18} On June 6, 2021, Mother had another weekend visit with the Older Children. Upon their return to Father B, he notified CCDCFS that he "had some concerns" that they had suffered physical abuse during their time with Mother. CCDCFS observed that A.P. had "two black eyes, [R.J. had] like a golf-ball size lump on his forehead, and [I.J.] had what appeared to be like markings around his ankles, like almost like somebody's been holding [him] upside down." The Older Children were too young to be interviewed, but according to Green, the case file indicated that A.P. and R.J. reported that Father A "hurt us. [He] did this." As a result, the court

awarded emergency temporary custody of the Older Children to CCDCFS in August 2021.

{¶ 19} Mother admitted to the allegations in CCDCFS's amended complaint, A.P. and R.J. were adjudicated abused, I.J. was adjudicated dependent, and CCDCFS was granted temporary custody in November 2021. The court's order specified that Father A "shall not be at the location of visitation [or] within 1,000 feet of the children."

{¶ 20} As part of her work on Mother's case, Green developed a case plan with a permanency plan of reunification.

{¶ 21} During CCDCFS's involvement, it referred Mother to substance-abuse and mental-health assessments, domestic-violence services, and parenting classes. CCDCFS referred Mother to "New Visions for a dual diagnosis assessment" for substance use and mental health. Mother completed the assessment in July 2021 and was "diagnosed with cannabis use disorder. She was recommended for individualized counseling to address her substance use, her mental health, and concerns for domestic violence." Mother engaged in these services in August 2021, but "was unsuccessfully discharged on November 1, 2021 * * * [f]or a lack of attendance and compliance with services."

{¶ 22} Mother was also referred to West Side Community House ("WSCH") for a domestic-violence program in November 2021. According to Green, Mother was having visitation with the Older Children at WSCH and was "developing a

rapport with the provider" when it was mentioned that "they had a domestic violence program * * * [a]nd she signed herself up for services."

{¶ 23} WSCH's domestic-violence classes were held via Zoom. Green stated that she had to remind Mother "to complete her classes without her abuser present." Green elaborated that Mother's abuser was Father A and that Mother did not comply with the request that he not be present during classes. In November 2021, a domestic-violence "incident between mother and [Father A] was caught on camera." According to Green, Mother was attending the virtual domestic-violence class at the library when her device started to die. Mother walked home, while still on camera in the class, and when she arrived, Father A "was standing at the front door. There were some words or argument exchanged, and then West Side Community House report[ed] seeing [Father A] shove or push" Mother. Mother "typed in the chat * * * [p]lease help." Police were called to Mother's house, but the "parties did not open the door when police arrived."

{¶ 24} Green recalled another incident in November 2021 that occurred during one of Mother's supervised visits with the Older Children at WSCH. Green stated that during the visit, Mother was "very distracted" and on her phone a lot. At one point, they went outside to play on a playground when Mother went "ghostly, like white in the face." When Green asked if she was okay, Mother shook her head no and told Green that Father A "was trying to argue with her during her visit." Green reminded Mother that she only gets two hours to visit and that she should not "let anybody interrupt that." Mother agreed and put her phone away. Green then

noticed Father A standing outside of WSCH, which she perceived as "an intimidation tactic." Police were called, and Father A "fled." Mother asked Green to drive her to a family member's house after the visit "because she did not feel safe."

{¶ 25} Green stated that Father B, who was also participating at that supervised visit, notified Green that when he left, he encountered Father A standing "in the walkway where he needs to go" to go home. Father B told Green that he felt Father A was trying to intimidate him. Green noted that the two fathers had "previous fights" to which the police responded in the past.

{¶ 26} As a result of these incidents in November 2021, WSCH discharged Mother from the domestic-violence services. Green testified that Father A was arrested for the domestic-violence incident seen on camera shortly after Mother's discharge from services and WSCH offered for her to reengage with its services. Mother did not reengage.

{¶ 27} In January 2022, Mother did engage. She completed substance-use, parenting, and domestic-violence services the following month.

{¶ 28} Mother gave birth to J.K. on March 10, 2022. According to Green, CCDCFS was concerned about Father A's upcoming release from incarceration and the fact that he and Mother were maintaining a relationship. As a result, CCDCFS filed a motion to adjudicate J.K. neglected and dependent.

{¶ 29} Father A was released from incarceration on May 8, 2022. Following his release, CCDCFS sought protective supervision rather than temporary custody of J.K. because Mother had completed her substance-use, parenting, and domestic-

violence services, her visits with the Older Children were going well, and she and Father A reported that they were not having contact with each other. Further, Grandmother informed Green "that she was facilitating all communication" between Mother and Father A and also facilitating visitation of J.K. and Father A and Mother.

{¶ 30} CCDCFS altered Mother's supervised visitation to in-home unsupervised visitation for the Older Children. Following Mother's third in-home unsupervised visit in mid-June 2022,

> [t]he Agency received several intakes alleging that [Father A] was at mother's in-home visit. There was still a protection order for him and mother's oldest three * * *. [The Older] Children went home and reported that he was, you know, spanking or hitting them, and two of the children, I believe, were found to have some sort of mark on them that they did not come to the visit with.

Green described the injuries as "slight."

{¶ 31} According to Green, both Mother and Father A denied that Father A was at the visitation and they both reiterated they were not having contact with each other. Father A claimed that he was working during Mother's visit; however, when asked if anybody could verify that he was working, he said no. Green recalled that Mother "didn't have an answer" for how her children could have reported similar issues when they returned from their visit to their separate placements. Rather, Mother just stated, "Well, you know, [Father A] wasn't there." At a July 2022 dispositional hearing, Grandmother provided an "alibi" in support of Father A's claim that he was at work during the visit. At the hearing, Grandmother claimed

that she had brought Father A lunch to work at 11 a.m. in Cuyahoga County during Mother's in-home visitation. Green recalled that the visit was "from 12 to 4 in Akron."

{¶ 32} On July 28, 2022, CCDCFS's protective supervision of J.K. was altered to emergency temporary custody. At the hearing, Grandmother indicated that J.K. was at her home and the court ordered Grandmother "to turn [J.K.] over to CCDCFS * * *." When CCDCFS staff workers went to Grandmother's home to collect J.K., Mother and Father A arrived together, Father A "barricaded himself in the home," and police were contacted.

{¶ 33} CCDCFS was granted temporary custody of J.K. on August 16, 2022. In its August 16, 2022 journal entry, the court ordered Father A "not to be present at visits" and "not be within 1,000 feet of mother's home."

{¶ 34} Green identified a complaint from Parma Municipal Court charging Father A with aggravated menacing of Father B. According to Green, this complaint stemmed from an incident where Father A tried to hit Father B with his car on August 13, 2022. To Green's knowledge, Father A was arrested "within 14 days of this incident taking place."

{¶ 35} After this arrest, Mother told Green that "she had filed for a legal separation" from Father A. Green identified a complaint for legal separation filed by Mother on September 6, 2022. Green recalled that she had explained to Mother "that the separation that she was filing for from an Agency's standpoint would not be observed any differently than the separation she's been verbalizing" because

Mother had stated since "November 2021 when [Father A] was incarcerated that she was separated from her husband. And that was found to be untrue on several occasions." When Green asked Mother why she decided to file for separation from Father A, Mother stated it was because he had been cheating on her. Mother's case requesting a separation from Father A was dismissed because she "failed to appear or file a motion to continue."

{¶ 36} Following J.K.'s adjudication, Mother was referred to Journey for Women for domestic-violence services, which according to Green is a "rigorous" program. Mother started the program in August 2022 and completed it in November 2022. Green noticed a "change in [Mother's] behavior" after completing Journey for Women services, indicating that Mother was making progress. Mother was "completing services, she had filed for the separation. She was indicating [that] she was having no contact with her husband, [and] she did not plan to have contact with him once he was released" in addition to engaging in services "that would help benefit her life" outside of the ones referred to her by CCDCFS.

{¶ 37} Green stated that Father A was released from incarceration on February 6, 2023. In late February 2023, CCDCFS referred Father A for a dual diagnosis assessment for mental health and substance use, domestic-violence, anger-management, and parenting services.

{¶ 38} Father A completed a mental-health and substance-use assessment in March 2023. However, Father A's mental-health assessment was "inconclusive"

because "he didn't appear to be being honest and forthright" during the assessment and he did not follow up with his substance abuse referral.

{¶ 39} On March 13, 2023, Green asked Mother and Father A what the status of their relationship was. Mother "was forthright. She did state that they were together, living together, and that they had been together throughout the duration of this open case." When Green asked Mother why she had not previously informed the Agency about her continuing relationship with Father A, Mother stated that "she felt if she was honest about her relationship, then the agency * * * would gain permanent custody of her children."

{¶ 40} CCDCFS referred Mother and Father A to additional services. After learning that Mother and Father A were still in a relationship, Green explained that CCDCFS referred them to additional domestic-violence services. Mother was also referred to a medical-marijuana program because Green learned that Mother had obtained a medical marijuana card. According to Green, Mother "is not a proper candidate for a medical marijuana card," so while Mother had acquired a medical marijuana card, CCDCFS still tried to address Mother's "cannabis use disorder diagnosis."

{¶ 41} In addition, Green testified that she "encouraged" them to complete couple's counseling, explaining, "It's not an Agency referral that we can refer. It's not the Agency's recommendation that they maintain their relationship. It was just more so, this is what you all have decided to do. Here are the resources available to

you." Mother was also required "[t]o complete 20 sessions of mental health" through her case plan.

{¶ 42} Father A completed domestic-violence, anger-management, and parenting services on April 17, 2023. Green did not feel as though Father A benefitted from the services despite his completion of them.

{¶ 43} After his release from incarceration in February 2023, Father A was permitted weekly supervised visits with J.K. at a CCDCFS building. According to Green, this required special approval but the visits were held there due to "safety concerns because he had threatened several people" involved in the case.

{¶ 44} Father A's final supervised visit with J.K. was on May 24, 2023. Asked why that was his last visit, Green explained that the visit ended because Father A threatened Green after becoming upset about a conversation they were having. Father A "could not de-escalate himself." Following this incident, Father A was indicted for aggravated menacing and Green was removed from the CCDCFS case.

{¶ 45} Green identified a complaint that was filed in the Summit County Domestic Relations Court, which demonstrated that Mother filed for a divorce from Father A in June 2023. Green also identified an order from the Summit County Domestic Relations Court setting a hearing on Mother's divorce case for August 28, 2023. At the time of the Hearing, Green had not seen any evidence that Mother was granted a divorce as a result of the August 28, 2023 divorce hearing.

{¶ 46} Green testified that she did not have confidence in Mother's assertions that she was not going to be in a relationship with Father A going forward because "confidence is going to be built on a demonstration of a behavior change. That takes time, and I don't know that in May or June or July [2023], we would have had the appropriate time. These children have been in custody * * * two years."

{¶ 47} Further, Green acknowledged that Mother had completed domestic-violence services as part of her case plan, but because Mother did so while not being forthcoming about her ongoing relationship with Father A, Green classified them as being "completed under false pretenses." Green acknowledged that "domestic violence is actually a pattern of behavior for [Mother]. She's had domestic violence with two of her other children's fathers. And that if [Father A] is out of the picture, if we don't remedy the concerns related to domestic violence, she can find another [Father A]."

{¶ 48} At the time of the Hearing, CCDCFS also had "stability concerns" regarding Mother's housing because Mother was "no longer living in her independent housing in Akron" and was unemployed.

{¶ 49} The Older Children have been in their current placements since October 2021. J.K. has been in his placement since July 28, 2022.

### 2. Services Received by the Older Children

{¶ 50} A.P. received "weekly therapy for a diagnosis of adjustment disorder, as well as post-traumatic stress disorder." A.P. has also been evaluated for an IEP. R.J. received "early childhood mental health services. He also has a diagnosis for

post-traumatic stress disorder." I.J. received early childhood mental-health services as a preventative measure. According to Green, each of the Older Children "struggle with emotional behavioral functioning."

{¶ 51} Green identified records and notes from A.P.'s treating therapist that were admitted into evidence. Those therapy notes contained narratives that A.P. was "angry and fearful of the case manager" after Mother told her that "the case manager took the six-month old baby away from mother"; "open about her abuse by [Father A] and how she would be afraid and hide from him"; and "worried [Father A] will show up to a visit" after Mother told her that she got him out of jail and that he was living with Mother. In one therapy session, A.P. wanted to lock the door so that Father A could not get in. A.P. also expressed that she did "not want to go on visits with mother due to fear that [Father A] will be there" but a week later stated she wanted "to see [Mother] on a visit so she can [get] press on nails and get treats. [A.P.] states she does not want to live with [Mother]" but states otherwise when she is upset and not getting her way. Green stated that at the time of the hearing, A.P. was five years old.

{¶ 52} Green's testimony is consistent with the therapy notes admitted into evidence.

### 3. Green's Testimony Regarding Grandmother

{¶ 53} During her involvement in the case, Green spoke to Grandmother on numerous occasions. Green testified that she believed Grandmother was aware of Father A's violent behavior.

{¶ 54} Grandmother was one of the family members CCDCFS "investigated" through its placement department in July 2022. According to Green, Grandmother's application was denied because "there was some social service[s] history on the application * * * involving an indicated physical abuse * * *." The physical abuse "was not recent" but Grandmother also "had an OVI-related conviction," and CCDCFS also had mental health concerns.

{¶ 55} Additionally, CCDCFS received an "intake" regarding an incident in July 2021 where Mother, who was pregnant at the time, and Father A were at Grandmother's house. Grandmother had custody of Father A's daughter, A.K., who is not involved in the present case. According to the "intake," Father A told A.K. "to punch [Mother] in the stomach." A family member intervened and told A.K. not to do so. Father A responded by "punching [the family member] twice [and] knocking her out." Grandmother was called and asked to come home. When she arrived, Father A "ran her over with his car. She hit the windshield, he pressed the brakes, and she flew off." As a result of this incident, Green was notified that criminal charges were filed, and she believed "that this was the parole violation that landed [Father A] in jail in November 2021." However, Green learned that the witnesses did not cooperate following the incident and no conviction resulted from this incident to Green's knowledge.

### D. Vivette Evans

{¶ 56} Vivette Evans ("Evans") is a Child Protection Specialist with CCDCFS. Evans was the assigned case worker on Mother's case at the time of the Hearing. Evans began working on Mother's case in early summer 2023.

{¶ 57} According to Evans, Mother was living with "maternal grandmother" at the time of the Hearing but was "in the process of locating a new residence for herself." Further, Mother was unemployed but seeking employment.

{¶ 58} As part of Mother's substance-use services, CCDCFS required Mother to participate in drug screenings, and Mother "acknowledged she has not been consistent with screenings" to Evans. Evans was unaware of Mother's sobriety at the time of the Hearing.

### E. Mother

{¶ 59} At the time of the Hearing, Mother was 23 years old.

{¶ 60} Mother acknowledged that this was not her first relationship that involved domestic violence. She described her prior relationship with A.P.'s father as "kind of the same" but "less aggressive."

{¶ 61} Mother admitted that she "lied to [Green] thinking that that was [her] best route to go in telling [Green] things that she wanted to hear" because she "wanted [her] kids back." Regarding Green's testimony that Grandmother told her that she was facilitating communication between Mother and Father A, Mother explained that she and Father A would often "tell her one thing and, and [they] do

another" and that Grandmother was "not aware" that they were still in a relationship.

{¶ 62} Mother claimed that if she regained custody of the Children, Father A would not be a part of their lives. Mother recognized that had she received custody earlier, Father A would have been a part of their lives and that would have been a mistake. Mother explained:

> Obviously, it was a mistake because it was a very toxic, unhealthy environment. I feel awful for even contemplating letting my children come back and like lie to the Social Worker about me and him being together because I don't want him around them.
>
> He's very compulsive, manipulative, angry. I just — That's somebody I don't want around my children, especially because they need to learn that it's not okay for them to — I don't want them to think that it's okay to see somebody like that or to be around people like that, and it's just not healthy. They're very vibrant children and I want them to thrive in a great environment.

{¶ 63} Mother received a protection order against Father A on June 14, 2023, and the same day had made him move out of her apartment. Asked why Mother recanted her accusation of domestic violence after police arrived on June 14, 2023, Mother answered, "Because we got into a verbal altercation and just that was the day that I was just like I've had enough. Like there's only so much like one person can take after so long after dealing with abuse after abuse after abuse. Like I just didn't want to deal with it anymore. I was fed up. I was just done with it." Mother claimed that the reason she told police that Father A "had put his hands on [her]" initially was because she "felt like that was the only way for them to get him out of [her] life."

{¶ 64} Mother did not press charges against Father A after the July 4, 2023 incident involving the bottle of cologne because she was scared and felt as though the incident was her fault. Mother explained that she knows the domestic-violence incidents are not her fault "but in those moments, [she] felt like there's something [she] could have changed."

{¶ 65} During the time she was in a relationship with Father A, Mother thought she "could change a person from being like violent to somebody to be a loving, happy father." Mother thought she "could make him a better person." She learned from the couples counseling that Green encouraged her to go to with Father A that she is "not able to change anybody. [She] can only work on [her]self and to continue better [her]self."

{¶ 66} Asked what she could say to the court to demonstrate that she would not be in another violent relationship, Mother answered:

> I've learned my lesson. I know that * * * It's my fault that I allowed my kids around those situations, but I learned my lesson that that will not happen again. * * * My children are more important than any man in this world. Their safety comes first, and making sure that they're okay is my first priority. * * * I will be the first one to say that prior, that that wasn't my first priority, and that was my mistake. But now they are my number one, * * * to make sure that they thrive and keep thriving. I mean they're thriving now.

{¶ 67} Further, if Mother's case plan was expanded, she stated that she "would do everything that's asked of" her and be "grateful that [she] would have the opportunity to show that [she has] grown as a person * * *."

{¶ 68} Mother claimed that she did go forward with a divorce against Father A. However, on cross-examination, Mother identified a journal entry from August 30, 2023 (the date of the hearing) that stated, "Neither party appeared at the uncontested hearing time * * * nor did either party contact the court or move to continue the hearing * * *." And the case was dismissed without prejudice. Mother admitted on cross-examination that her divorce "wasn't granted."

{¶ 69} Mother moved in with her mother because she did not want the Children to be in the apartment "where a lot of violence has happened."

{¶ 70} Mother testified that for a time, she worked as an advocate in a domestic-violence shelter. Mother took the job because she "felt like [she] could not only benefit from, but also teach other women that [she] was in the same place as them and [she] know[s] that it feels during that time that there's no way out and that it's their fault." However, at the time of the Hearing, Mother was unemployed.

{¶ 71} Mother expressed that her "bond is strong" with the Children. A.P. has expressed "that she does want to be with" Mother but does not want Father A to be there. R.J. is a "mama's boy" and "sticks by [Mother's] side." Mother stated that she read to I.J. and tried to teach him the alphabet and numbers at visits. Mother also tried to teach J.K. how to say "mommy" at visits. Asked why she felt it was best for the Children to be with her, Mother stated:

> I know that it doesn't mean a lot, but I am their mother and I love them more than anything in the world. And I would make sure that nothing like this ever, ever, ever happens again. And I would make sure that I take great care of them and that they — you know, that they still go to therapy, and, you know, get the help that they need from my mistakes.

And to make sure that they go to school, and I help them with their homework, and help them continue to grow.

{¶ 72} Mother thought Grandmother would be able to handle caring for each of the Children if Grandmother were granted custody because "she has a lot of support on her end." Mother based her opinion on how Grandmother cares for "the two kids she has now." Asked how Mother thinks Grandmother would be able to ensure the Children are not left unattended with Father A:

> I would think that given the circumstances of this case, she wouldn't jeopardize having them go back in foster care * * * that she wouldn't jeopardize losing them again. And — I mean, I know that it isn't just we're going to — you guys drop the kids off at her house and you guys are just gone, I would assume that they would do their checkups to make sure that the kids are safe and making sure that everything is okay.

{¶ 73} Asked by the court whether learning that legal custody to Grandmother would mean no agency involvement, if that changed her "opinion about things," Mother responded "Yes."

### F. Grandmother

{¶ 74} Grandmother lives with her two daughters, her two granddaughters, and her ex-husband. If Grandmother was granted custody of the Children, Grandmother testified that her daughters, ex-husband, and the other grandmother of one of her granddaughters would help watch the Children while she was at work. She also stated that she could send the Children to daycare. However, Grandmother noted that one of her daughters would be moving out shortly after the Hearing.

{¶ 75} Grandmother was granted custody of two granddaughters on May 26, 2021. Those children are not part of the present appeal.

{¶ 76} Grandmother's home has four bedrooms and two bathrooms. Asked what the sleeping arrangements would be if granted custody of the Children, Grandmother stated that I.J., R.J., and J.K. would share a bedroom. A.P. and her two other granddaughters would share a bedroom.

{¶ 77} Grandmother claimed that Father A never hit her with his car, rather he sped "down the street" and it looked "like he tried to hit [her] with the car." When presented with a police report of the incident, Grandmother acknowledged that in the report, her ex-husband claimed that Father A "hit [Grandmother] with the front of the automobile after several attempts. * * * [S]he rolled up onto the hood of the car and was thrown off and believes her head hit the curb. * * * [B]oth victims then got into a car and left for Fairview Hospital." However, Grandmother reiterated "[t]hat is what [the report] says. That is not what happened."

{¶ 78} Grandmother testified that she would honor a court order prohibiting Father A from seeing the Children. Asked how she could demonstrate to the court that she would honor that, Grandmother responded:

> I have four biological children. * * * else who may come into their life, I will always do what is best for them, what is safest for them. And if you tell me that he can't be around them because that's what's safest and that's what keeps my grandson safe, then that's what's going to happen.
>
> I am not here to win favors or make friends or to prove anybody unlikeable. That's not what I'm here for.
>
> You want a guarantee that he'll never be around them, you can make that guarantee. Will it hurt? Yeah. He's my son. Do I think my son is an idiot? Most of the time. And he loves his son. I'll tell his son that he loves him, but [Father A] needs to make better choices. [Mother] needs to make better choices.

{¶ 79} Grandmother believed that it was in the best interest of the Children to be in her custody rather than CCDCFS because of the statistics regarding children in foster care and because she can provide them with family.

{¶ 80} Asked about her mental health, Grandmother stated that she had "a little bit of anxiety about flying." Grandmother also asserted that contrary to Green's testimony she did not have an OVI conviction.

### G. Caregiver Statements

{¶ 81} The Older Children's foster parents addressed the court and made statements on the record.

{¶ 82} A.P.'s foster mother stated that A.P. came to her house "shy, scared, and unable to communicate her needs or emotions successfully, and struggled to make healthy attachments with others." During her time with her foster parents, A.P. has completed speech therapy, made friends, "and with ongoing therapy has been able to open up about her past experiences and feelings about them and start * * * working through those emotions that come along with that." A.P.'s foster parents informed the court that they believed "it would likely do more damage to [A.P.] by taking her out of her placement and reunifying her with family than keeping her in her current placement that she has been in for the past 668 days, or one year, nine months, and 30 days."

{¶ 83} I.J. and R.J.'s foster mother informed the court that I.J. and R.J. have been with her family for 22 months and during that time they "have been part of our family experiencing the good times, holidays, vacations, church and family

gatherings, and normal everyday moments. And the difficulties, too." I.J. and R.J.'s foster parents' "hope for [them] is that they will continue to make strides in building trust with [their foster parents] and other adults, that they will have healthy relationships with others, and that they will remain in a loving and safe environment for the rest of their lives."

**H. GAL**

{¶ 84} At the Hearing, the Children's GAL submitted a written report and made the following recommendation on the record:

> The case started with facial bruises to the children, and went from temporary custody to potentially protective supervision, because while [Father A] was incarcerated, the mother made real progress on her case plan, and I advocated for protective supervision. And then there were more bruises on the children's face and we went to TC again. The mother would always make progress when [Father A] was incarcerated, and he's been incarcerated I believe three times for a period during this case.
>
> The children have been traumatized from before the case opened going from parent to parent witnessing domestic violence, instability. * * *
>
> And currently all the — the three older children need constant, near constant, frequent redirection. They all have mental health issues. They are all receiving therapy. They were partially not kept in the same foster home because it was so difficult for the foster parents to control them. They needed a lot of individual attention.
>
> [A.P.] was assessed for an IEP in preschool. She did — they decided not to have one at the time, they'd reassess her later. She just started kindergarten. There's already a number of incident reports for her aggression and keeping her hands to herself.
>
> All the children are in foster-to-adopt placements. They've been there for a long time. They're all doing well.
>
> The case is now over two years old. No parent is currently ready to accept custody. * * *

And the mother, * * *, just failed to benefit from services. I mean, before our last trial date, there were two recent police reports on domestic violence. We don't even have a divorce. There was testimony there was a divorce, but the divorce never occurred.

* * * We always encouraged the [M]other to focus on herself and her children and she said she was, but she was really trying to get her whole family together. She was dishonest I don't think with the case worker, but with me. I can't see the children returning.

As to [Grandmother], the three older children have no real relationship with her. Only [A.P.] even knew who I was talking about because she had seen her in a recent Zoom video with her mother. And if [A.P.] was — if we told her she would be at [Father A's] mother's house, she would be hysterical at the thought of returning to anything associated with him. She wouldn't go to visits with her mother for fear that he would be there.

So I have some serious questions about [Grandmother] as to the baby, her biological child. I wouldn't object to a third KCAR assessment. I can't picture it being that much different, especially based on some of the testimony today, but I wouldn't object to it.

So subject to a new assessment on the [G]randmother, I believe permanent custody is in the best interest of the children.

{¶ 85} The GAL recommended that permanent custody be granted to CCDCFS but stated he "wouldn't object" if another assessment was completed for Grandmother to gain legal custody of J.K.

### III. Law and Analysis

### A. First Assignments of Error

{¶ 86} In their first assignments of error, Mother and Father A each argue that the juvenile court's findings were not supported by clear and convincing evidence when it granted permanent custody of the Children to CCDCFS. We disagree.

### 1. Standard of Review — Permanent Custody

{¶ 87} "Courts apply a two-pronged test when ruling on permanent custody motions." *In re De.D.*, 8th Dist. Cuyahoga No. 108760, 2020-Ohio-906, ¶ 16. "To grant the motion, courts first must find that any of the factors in R.C. 2151.414(B)(1)(a)-(e) apply. Second, courts must determine that terminating parental rights and granting permanent custody to CCDCFS is in the best interest of the child or children using the factors in R.C. 2151.414(D)." *Id.*

{¶ 88} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24. The Ohio Supreme Court recently clarified this standard in *In re Z.C.*, Slip Opinion No. 2023-Ohio-4703, holding that when reviewing a juvenile court's award of permanent custody and termination of parental rights, "the proper appellate standards of review to apply * * * are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties" rather than an abuse-of-discretion standard. *Id.* at ¶ 18.[1]

---

[1] On appeal, Mother argues that the juvenile court abused its discretion when it granted permanent custody to CCDCFS of the Children. However, pursuant to *In re Z.C.*, the juvenile court's award of permanent custody will be reviewed for whether clear and convincing evidence in the record supports the court's findings rather than an abuse of discretion.

## 2. R.C. 2151.414(B)

### a. The Older Children

{¶ 89} R.C. 2151.414(B)(1)(d) is satisfied if the child has been in agency custody for 12 or more months of a consecutive 22-month period. CCDCFS's motions for permanent custody argued that this provision applied to the Older Children. We agree.

{¶ 90} Evidence in the record demonstrates that the Older Children were in CCDCFS custody for 12 or more months of a consecutive 22-month period. As noted by the trial court in its September 14, 2023 journal entry granting permanent custody of the Older Children to the Agency, the Older Children were placed in the Agency's emergency temporary custody on August 27, 2021. The Older Children were later adjudicated abused and dependent on November 3, 2021, and committed to the Agency's temporary custody. CCDCFS filed its motion to modify temporary custody to permanent custody of the Older Children on December 19, 2022. Therefore, the Older Children had been in agency custody 12 months of a consecutive 22-month period at the time CCDCFS filed its motion.

### b. J.K.

{¶ 91} R.C. 2151.414(B)(1)(a) is satisfied if the child has not been abandoned or orphaned or been in agency custody for 12 or more months of a consecutive 22-month period and "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." In its

motion for permanent custody, CCDCFS argued that R.C. 2151.414(B)(1)(a) applied to J.K. We agree.

{¶ 92} Evidence in the record demonstrates that J.K. was not in CCDCFS custody for 12 or more months of a consecutive 22-month period. As noted by the trial court in its September 14, 2023 journal entry granting permanent custody of J.K. to the Agency, J.K. was adjudicated neglected and dependent on June 16, 2022. CCDCFS filed its motion to modify temporary custody to permanent custody of J.K. on February 13, 2023. Consequently, J.K. had not been in agency custody 12 months of a consecutive 22-month period at the time CCDCFS filed its motion.

{¶ 93} To assess whether J.K. cannot be placed with either of his parents within a reasonable time or should not be placed with either parent, the juvenile court considered the factors in R.C. 2151.414(E), finding that "one or more factors in division (E) of this section exist." We agree. We find that clear and convincing evidence in the record supports the juvenile court's findings.

{¶ 94} An analysis of the court's subsection (E) findings is addressed next.

### 3. R.C. 2151.414(E) Factors

{¶ 95} Under R.C. 2151.414(E), if the court determines that one or more of the (E) factors exists as to "each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." In its September 14, 2023 journal entry, the juvenile court found as follows regarding J.K.:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the

agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the Court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(3) The parent committed any abuse as described in section 2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

(13) [Father A] is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

(15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

{¶ 96} Additionally, the court made similar subsection (E) findings for each of the Older Children.

{¶ 97} We find that the juvenile court's findings that the Children cannot or should not be placed with Mother or Father A are supported by clear and convincing evidence in the record.[2] Specifically, the court's subsection (E) findings support the court's R.C. 2151.414(B)(1)(a) findings with regard to J.K.

### a. J.K.

{¶ 98} The evidence demonstrated that domestic violence had been a persistent problem for Mother throughout the pendency of this case and that she has had domestically violent relationships in addition to her relationship with Father A. As recently as June and July 2023, the police were again called to address domestic violence allegedly perpetrated by Father A against Mother. Over the course of this case, Mother covered up for Father A when the Older Children reported that Father A harmed them. Mother repeatedly lied about the status of her relationship with Father A.

{¶ 99} While we acknowledge that evidence in the record demonstrated that at one point during this case Mother had completed her case-plan services, Green and the Children's GAL both expressed concern that Mother had not benefitted from those services, specifically the domestic-violence services. Green testified that while Mother had completed domestic-violence services, she did so "under false pretenses" because Mother had maintained a relationship with Father A while claiming they were no longer together while she was engaged in those services.

---

[2] Mother and Father A's second assignments of error relate to the trial court's (E)(1) findings regarding the Agency's efforts, which will be addressed separately below.

Green expressed concern that Mother would enter another domestically violent relationship even if she separated from Father A. The Children's GAL echoed Green's concerns that Mother "failed to benefit from services" in his recommendation to the court.

{¶ 100} As it pertains to Father A, the court heard from Green that Father A was incarcerated numerous times throughout the pendency of the case and he was presently incarcerated at the time of the Hearing. Furthermore, Father A was referred for a mental-health and substance-use assessment and Green testified that the mental-health assessment was "inconclusive" due to concerns that he was not honest during the assessment. Additionally, Father A did not engage in services following a substance-use referral. While Father A did complete his domestic-violence, anger-management, and parenting services in April 2023, the court heard that Green did not feel he benefitted from those services despite his completion of them. In support of that proposition, the court heard from two Akron police officers detailing domestic-violence incidents between Father A and Mother in June and July 2023.

{¶ 101} While there were no allegations of abuse suffered by J.K., the evidence supports the court's findings as relates to neglect. Pursuant to R.C. 2151.03, a child is considered neglected when the child "lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian[.]" Mother and Father A admitted to the allegation in the complaint that they "need to demonstrate the judgment and decision skills necessary to provide safe and

appropriate care to [J.K.]." Further, Mother stipulated that her "three older children were adjudicated abused and dependent, due in part to Mother's lack of appropriate parenting judgment."

{¶ 102} As previously stated, Mother and Father A continued their domestically violent relationship throughout the pendency of the case, which allowed Father A continued access to the Children, including J.K. Father A had not only harmed Mother but also the Older Children. Police intervention was required after CCDCFS was awarded emergency temporary custody of J.K. Upon CCDCFS arriving at Grandmother's house to retrieve J.K., Mother and Father A arrived there together. Father A barricaded himself inside the house, presumably with J.K., which required police intervention to retrieve J.K. While Mother claimed to be seeking a divorce from Father A, there was no evidence in the record that she had been successfully granted a divorce, and CCDCFS was concerned that Mother may enter another domestically violent relationship because she did not benefit from domestic-violence services.

{¶ 103} Additionally, the evidence showed that Mother was "no longer living in her independent housing in Akron" and was unemployed at the time of the Hearing. Father A was incarcerated numerous times throughout this case and was incarcerated at the time of the Hearing.

### b. The Older Children

{¶ 104} Regarding abuse, the court heard about numerous incidents where the Older Children suffered abuse from Father A while in Mother's care and that

Mother would claim that Father A was not present when the Children suffered the injuries.

{¶ 105} The court's R.C. 2151.414(E) findings are supported by clear and convincing evidence in the record.

## 4. R.C. 2151.414(D)(1) Best-Interest Factors

{¶ 106} The September 14, 2023 journal entries reflect that the court considered the best-interest factors under R.C. 2151.414(D)(1)(a)-(e), as follows:

> The interaction and interrelationship of the child with his parents, siblings, relatives, and foster parents; the wishes of the child; the custodial history of the child, including whether he has been in temporary custody of a public child services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period; his need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

> The Court finds that all the factors in (D)(1) apply in this matter and weigh in favor of permanent custody except for the last factor for RJ[,] IJ, [and JK] which does not apply.[3]

{¶ 107} Upon review, we find that the juvenile court's findings are supported by clear and convincing evidence in the record. The GAL stated that each of the Children were in "foster-to-adopt placements" that they have been in "for a long time" and each of them are "doing well." Additionally, the court heard from the Older Children's foster parents and heard that each of the Older Children had

---

3 The juvenile court found that A.P.'s father had abandoned her. A.P.'s father did not appeal the termination of his parental rights; accordingly, this finding is not being challenged on appeal.

acclimated to the foster families and had made progress while with them. The Children's GAL opined that permanent custody to the Agency would be in the Children's best interest.

{¶ 108} On appeal, Mother and Father A challenge the court's best interest findings arguing that the court could have granted legal custody of the Children to Grandmother and that would have been a legally secure placement achieved without granting CCDCFS permanent custody.

{¶ 109} While we note that the GAL stated that he "wouldn't object" to further assessment into whether legal custody of J.K. should be granted to Grandmother, he also noted that he "can't picture it being that much different" than the previous assessment that denied her application. Furthermore, regarding Grandmother, the court heard that while Grandmother was granted custody of two other children through CCDCFS involvement, CCDCFS did not feel that legal custody to Grandmother was appropriate in the present case. The court heard about A.P.'s constant fear of Father A and the GAL's belief that if she were told that she was going to live with Grandmother that "she would be hysterical." This is supported by A.P.'s therapy notes admitted into evidence that demonstrate that during her therapy sessions she would often hide, lock the door, and express fear that Father A would show up. Additionally, the GAL noted that the Older Children do not have a relationship with Grandmother.

{¶ 110} Regarding the Children's need for a legally secure permanent placement, the court heard from numerous witnesses that Mother had not been

honest throughout the pendency of this case regarding her relationship with Father A. Green and Mother testified that Mother lied to CCDCFS regarding her ongoing relationship with Father A because she thought she would not receive custody of the Children if she was honest. The two Akron police officers testified that Mother would call for help and make accusations of domestic violence against Father A but would later retract those statements notwithstanding the obvious injuries the officers noticed.

{¶ 111} Accordingly, each of the juvenile court's findings are supported by clear and convincing evidence in the record and the juvenile court's grant of permanent custody of the Children to CCDCFS was not against the manifest weight of the evidence. In making these findings we are mindful of the fact that Mother was, herself, a victim throughout the pendency of this case and our finding that the court's award of permanent custody of the Children to CCDCFS does not ignore that fact. Mother's and Father A's first assignments of error are overruled.

**B. Second Assignments of Error**

{¶ 112} In their second assignments of error, Mother and Father challenge the efforts of CCDCFS. Mother argues that "the Agency failed to use reasonable efforts to reunify this family prior to filing for permanent custody." Father disputes the trial court's finding that the Agency used "reasonable efforts and diligent case planning by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home."

**{¶ 113}** As acknowledged by Father A, "a juvenile court is not required to make a reasonable-efforts determination when it was ruling on a motion for permanent custody." *In re B.P.*, 8th Dist. Cuyahoga No. 112332, 2023-Ohio-1377, ¶ 19, citing *In re I.A.-W.*, 8th Dist. Cuyahoga No. 111217, 2022-Ohio-1766, ¶ 17. Rather, if the court finds that the child cannot be placed with the parents within a reasonable time or should not be placed with the parents relying on R.C. 2151.414(E)(1), as the court did here, it must find that "notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents" the parents failed to remedy the conditions that led to the child's removal.

**{¶ 114}** "'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.'" *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. "In other words, the agency must use reasonable efforts to help remove the obstacles preventing family reunification." *In re L.G.*, 8th Dist. Cuyahoga No. 110789, 2022-Ohio-529, ¶ 60, citing *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶ 76. "The issue in a reasonable-efforts determination is not whether the agency could have done more, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case." *In re A.F.*, 8th Dist. Cuyahoga No. 110503, 2021-Ohio-4519, ¶ 35.

{¶ 115} As previously stated, we find that the juvenile court's R.C. 2151.414(E)(1) finding is supported by clear and convincing evidence. The court heard that while Mother and Father A had completed some case-plan services during the pendency of the case, the court also heard that Green did not feel they had benefitted from those services based upon their actions. When Green learned that Mother and Father A chose to continue their relationship, she referred them for more domestic-violence services and encouraged them to seek out couple's counseling. However, despite the case-plan services referred to them by CCDCFS, in June and July 2023, two domestic-violence incidents resulted in police involvement. After the first incident Mother did secure a protection order; however, the second incident happened less than a month later.

{¶ 116} Accordingly, Mother's and Father A's second assignments of error are overruled.

## IV.   Conclusion

{¶ 117} Upon review, we find that the court properly considered the relevant statutory factors when it found that granting permanent custody to CCDCFS was in the best interests of the Children. We find that clear and convincing evidence in the record supports the trial court's decision to terminate Mother's and Father A's parental rights and grant permanent custody of the Children to CCDCFS.

{¶ 118} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

MICHELLE J. SHEEHAN, P.J., and
ANITA LASTER MAYS, J., CONCUR